INTERNET LAW LIBRARY, INC. and Hunter M.A. Carr, Plaintiffs

v.

SOUTHRIDGE CAPITAL MANAGE-MENT, LLC; Steve Hicks; Dan Pickett; Christy Constabile; Thomson Kernaghan & Co., Ltd.; and Cootes Drive, LLC, Defendants.

Cootes Drive LLC, Plaintiff

v.

Internet Law Library, Inc., Defendant.

Bill U. Brewer, Marc Caldwell, et al. Plaintiffs

v.

Southridge Capital Management LLC; Stephen Hicks; Daniel Pickett; Christy Constabile; Thomson Kernaghan & Co., Ltd.; TK Holdings, Inc.; and Mark Valentine, Defendants.

No. 01 Civ. 6600(RLC).

United States District Court, S.D. New York.

July 17, 2002.

Koerner Silberberg & Weiner, LLP, New York, NY (Carl S. Koerner, Maryann Peronti, of counsel), Christian Wukoson Smith & Jewell, Houston, TX (Gary M. Jewell, of counsel), O'Quinn, Laminack & Pirtle, Houston, TX (W. Shawn Staples, of counsel), for ITIS Inc. (f/k/a Internet Law Library, Inc.).

Brobeck, Phleger & Harrison LLP, Broomfield, CO (Caryn G. Mazin, of counsel), for Cootes Drive LLC; Southridge Capital Management LLC; Stephen Hicks, Daniel Pickett; Christy Constabile, Thomson Kernaghan & Co., Ltd., TK Holdings, Inc., and Mark Valentine.

## OPINION

ROBERT L. CARTER, District Judge.

Formerly known as Internet Law Library, Inc., plaintiff ITIS Inc. ("ITIS") and its CEO, Hunter Carr, along with several

of its shareholders, bring this action against defendants Southridge Capital Management LLC ("Southridge"), Stephen Hicks, Daniel Pickett, Christy Constabile, Thomson Kernaghan & Co., Ltd. ("Thomson Kernaghan"), Mark Valentine, TK Holdings, Inc. ("TK"), and Cootes Drive LLC ("Cootes Drive") alleging their involvement in a scheme to defraud plaintiffs and to manipulate downward the price of ITIS stock in violation of federal and state laws. Defendants now move to dismiss the Amended Consolidated Complaint with prejudice pursuant to Rule 12(b)(6), F.R. Civ. P. for failure to state a claim and Rule 9(b), F.R. Civ. P. and the Private Securities Litigation Reform Act of 1995 ("PSLRA") for failure to plead fraud with sufficient particularity. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

This action is the by-product of the consolidation of several related actions—*Internet Law Library, Inc., et al. v. Southridge Capital Management, LLC, et al.*, 01 Civ. 6600(RLC) and *Brewer, et al. v. Southridge Capital Management LLC, et al.*, 02 Civ. 0138(RLC), both transferred from the Southern District of Texas, and *Cootes Drive LLC v. Internet Law Library, Inc.*, 01 Civ. 0877(RLC), originally filed in this court. ITIS, a Delaware corporation owning subsidiaries that operate Internet sites specializing in legal and other types of research and litigation support services, is a publicly-traded company whose stock trades on the NASDAQ over-the-counter bulletin board. In March, 2000, ITIS was in the process of seeking out capital in fulfillment of its business plan and, to that end, CEO Carr was referred to defendant Southridge. Negotiations between Carr, acting on behalf of ITIS, and Hicks, Pickett, and Constabile, acting on behalf of Southridge and later Cootes Drive, ensued throughout March and April, 2000.

During these negotiations, plaintiffs allege that defendants Hicks, Pickett, and Constabile made a number of misrepresentations, including that capital of up to $28 million, as needed by ITIS, consisting of a $3 million convertible preferred stock purchase and a $25 million equity line agreement, would be provided to ITIS, that defendants would refrain from selling ITIS stock for a year after the closing because they had a long-term investment interest in ITIS, that they would not manipulate ITIS stock with the intention of depressing its price, that they would not engage in the short-selling of ITIS stock, that Southridge was an accredited investor able to satisfy its funding commitment, that ITIS stock was being acquired for investment purposes and not for distribution or resale, that the stock of other companies funded by entities affiliated with the defendants had appreciated, and that defendants were not the subject of any active lawsuits. Throughout the negotiations, Carr, according to plaintiffs, continually inquired of Southridge and its agents about concerns regarding short-selling and stock manipulation and was repeatedly assured by Hicks, Pickett, and Constabile that no person associated with Southridge or its agents was engaged in short sales or manipulating ITIS stock, that no person would engage in such activities in the future, and that no sales would take place for a year after any closing. On the eve of the close of negotiations, however, defendants insisted that the no-short-sale period be reduced to six months.

In reliance on the misrepresentations described above, on or about May 11, 2000, ITIS entered into a Convertible Preferred Stock Purchase Agreement ("Stock Purchase Agreement") with Cootes Drive, in-

serted in lieu of Southridge as a signatory at the last minute.[1]

Pursuant to the terms of the Stock Purchase Agreement, ITIS submitted registration statements to the Securities and Exchange Commission to enable common shares to be issued to Cootes Drive upon conversion. Some time before the second registration statement became effective, defendant Thomson Kernaghan, acting for itself and on behalf of the defendants, allegedly sold ITIS stock short and otherwise manipulated the stock, despite representations that it would not do so. Specifically, the Amended Consolidated Complaint alleges that on July 18, 2000, Thomson Kernaghan sold 1,500 shares of ITIS stock short; on July 19, 2000, it sold 5,000 shares short; on July 27, 2000, it sold 10,000 shares short; on October 5, 2000, it closed 19,306 shares short; on October 6, 2000, it closed 29,306 shares short; and on October 10, 2000, it closed 61,806 shares short. A similar pattern of short sales continued until Thomson Kernaghan's short position had increased to nearly a million and a half shares by January 19, 2001 and back down to 876,894 shares by February 2, 2001, three days before Cootes Drive filed suit against ITIS in this court for breach of contract and fraud.

In general, plaintiffs allege that this short-selling activity was part of a larger strategy that defendants have repeatedly employed to manipulate the stock price of companies in which they have invested. According to plaintiffs, defendants Hicks, Pickett, and Valentine are seasoned practitioners of "death spiral" funding schemes in which they provide financing to a target company and proceed to aggressively short-sell its stock in the hope that such short sales will drive down its price. This price drop, in turn, enables the defendants to obtain more shares of common stock upon conversion by virtue of an arrangement known as a "toxic convertible" that allows the company's preferred stock to be converted at a discount to the present market value of the common stock issuable upon conversion. Defendants then use the additional shares obtained upon conversion to cover their short positions, profiting handsomely from the difference between the price at which the stock was sold short and at which it was converted. There are even times, according to plaintiffs, when defendants need not cover at all, typically when they have succeeded in driving down the stock price of the target company practically to zero. Moreover, the defendants use the stock from the conversion to push the stock price still lower, hence the characterization "death spiral." Plaintiffs have listed over 25 other companies in their Amended Consolidated Complaint that they believe have been the victims of toxic convertible or similar financing schemes orchestrated by defendants.

Plaintiffs allege that ITIS was the victim of one such toxic convertible financing scheme at the hands of Hicks, Pickett, Valentine, and Southridge or entities associated with them. After holding a short position that had ballooned to almost a million and a half shares by January 19, 2001, the Amended Consolidated Complaint alleges that Thomson Kernaghan set out to cover its short position, despite knowing or having reason to know that the Stock Purchase Agreement was being materially breached by such action, by issuing conversion notices to ITIS, requesting that ITIS issue shares to Cootes Drive, with Thomson Kernaghan acting as an agent for Cootes Drive. In all, Thomson Kerna-

---

1. Plaintiffs allege, on information and belief, that Cootes Drive is, in reality, only a "straw man" created for the purpose of funding the transaction between the parties and under the control of the defendants. (Am.Cons. Cplt.¶ 29.)

ghan sent ITIS 12 notices of conversion and succeeded in converting 139.02 shares of preferred stock into 3,137,907 shares of common stock. The Amended Consolidated Complaint further alleges, on information and belief, that Thomson Kernaghan, acting on behalf of itself and other defendants and with their involvement and knowledge, made use of a multitude of manipulative techniques including, without limitation, "painting the tape," "hitting the bids," and "dumping" large amounts of ITIS stock on the market, with an eye towards artificially affecting the price of ITIS stock, in violation of federal laws and regulations. The daily trading volume in ITIS stock mushroomed from 15,000 shares a day before the closing to an average of 365,157 in the period between September 29, 2000 and October 27, 2000.

As a result of such manipulation, plaintiffs allege that they have been damaged, that the price of ITIS stock was artificially depressed to the detriment of ITIS and its shareholders, both those present in this suit and elsewhere. The toxic convertible financing scheme, they allege, has been successful in running the price of ITIS stock into the ground, from a high of almost $7 to approximately 18 cents. Additionally, on account of defendants' manipulation of ITIS stock and the resulting price drop in the stock, Cootes Drive was excused from funding the $25 million equity line since the Stock Purchase Agreement conditioned funding on the stock of ITIS trading above a $1.50, further damaging plaintiffs. Accordingly, plaintiffs seek, among other things, the rescission of all agreements between ITIS and the defendants, declaratory relief excusing ITIS from honoring any future conversion notices by the defendants, damages of $200 million representing the decline in ITIS's market value caused by defendants' stock manipulation, damages of $100 million representing the decline in ITIS stock owned by Carr, damages for each of the individu-al plaintiffs equal to his/her losses in ITIS stock, an accounting for and disgorgement of all profits made by defendants in transactions involving ITIS stock, and attorney's fees.

## DISCUSSION

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), F.R. Civ. P., the allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor. *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir.1998). The court's function on such a motion is not to weigh the evidence but simply to determine whether the complaint is legally sufficient. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). In view of these guidelines, dismissal of a complaint for failure to state a claim is warranted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In making this determination, a court is permitted to look to documents that are incorporated into the complaint by reference, *Sabratek Corp. v. Keyser*, No. 99 Civ. 8589, 2000 WL 423529, at *2 (S.D.N.Y. Apr.19, 2000) (Baer, J.), or documents on which the plaintiff relied in making his claims or of which he had notice. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991).

*(1) Rule 9(b), F.R. Civ. P.*

■ Allegations of fraud are subject to heightened pleading requirements under the Federal Rules of Civil Procedure. These requirements dictate that "the circumstances constituting fraud ... shall be stated with particularity." Rule 9(b), F.R. Civ. P. To meet this high standard, fraud claims must specify: 1) the statements alleged by the plaintiff to be fraudulent, 2)

the speaker of those statements, 3) where and when the statements were made, and 4) the reasons for plaintiff's belief that the statements were fraudulent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *see also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995). Rule 9(b), F.R. Civ. P. is, as such, in place to furnish a defendant with fair notice of the claims against him, to safeguard his reputation from improvident allegations of wrongdoing, and to protect him from the commencement of a strike suit. *Shields,* 25 F.3d at 1128.

■ Defendants argue that the first claim for relief in the Amended Consolidated Complaint, alleging misrepresentation in violation of § 10(b) and Rule 10b–5 of the federal securities laws, must be dismissed because it fails, as a threshold matter, to identify the speaker of the statements mentioned therein, when and where the statements were made, and why they were fraudulent in nature. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 11–12.) The court disagrees. Plaintiffs' first claim is sufficiently plead to survive scrutiny under Rule 9(b), F.R. Civ. P.

■ As a general matter, a complaint "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged." *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1292–93 (S.D.N.Y.1996) (Sweet, J.); *see also SEC v. Parnes*, No. 01 Civ. 0763, 2001 WL 1658275, at *4 (S.D.N.Y. Dec.26, 2001) (Stanton, J.). Be that as it may, this caveat has no application to the present action since plaintiffs' Amended Consolidated Complaint alleges that Hicks, Pickett, and Constabile each made the fraudulent statements listed therein. Specifically, the Amended Consolidated Complaint alleges that "defen-dants Hicks, Pickett, Constabile, *and each of them,* and on behalf of Southridge and Cootes, made the following misrepresentations," which the Amended Consolidated Complaint then proceeds to enumerate. (Am. Cons.Cplt. ¶ 25 (emphasis supplied).) Despite this, defendants argue that the suggestion that defendants Hicks, Pickett, and Constabile each made all nine misrepresentations specified in the Amended Consolidated Complaint, as if they were reading from a script, is absurd and incredible. (Defs.' Rep. Mem. of Law in Supp. of Mot. to Dismiss at 6.) Such an observation goes to the weight of the pleadings, i.e., their inherent plausibility rather than their sufficiency. Since the court on a motion to dismiss is concerned with the latter as opposed to the former, it would be improper to entertain arguments of this variety at this juncture. *See, e.g., Jubran v. Musikahn Corp.*, 673 F.Supp. 108, 112 (E.D.N.Y.1987) ("Since the Court is bound, in the context of a motion to dismiss to [draw] all inferences favorable to the pleader, the Court must accept the veracity of plaintiffs' pleading.") (citations and internal quotations omitted) (dismissing, as premature, a defendant's attack on the credibility of the pleadings). In sum, there is little danger that defendants Hicks, Pickett, and Constabile will lack notice of or be confused as to what misrepresentations each is charged with having committed.

With regard to the defendants' claims that the pleadings fail to specify when and where each allegedly fraudulent statement was made, the court is, similarly, not persuaded that the Amended Consolidated Complaint is deficient. The Amended Consolidated Complaint alleges that the fraudulent statements were made during negotiations "all through March and April of 2000" that were "conducted by phone, fax and email, with Carr in Texas and Hicks, Pickett, and Constabile in Connecti-

cut." (Am.Cons.Cplt.¶ 24.) While the Amended Consolidated Complaint does not provide exact dates for the statements, a two-month period is sufficiently circumscribed to satisfy the requirements of Rule 9(b), F.R. Civ. P. *See, e.g., Harris v. Wells,* 757 F.Supp. 171, 173 (D.Conn.1991) ("Generally, a complaint need only apprise a defendant of the 'general time period' of any alleged misstatements to meet the requirements of Rule 9(b).") (citing *Int'l Paper Co. v. James,* No. 81 Civ. 4780, 1989 WL 240079, at *9 (S.D.N.Y. Oct.12, 1989) (Bernikow, M.J.)); *Vereins–Und Westbank AG v. Carter,* 639 F.Supp. 620, 623 (S.D.N.Y.1986) (Knapp, J.) (holding two-month period sufficiently particularized). Defendants argue that *Vereins–Und,* and other cases refusing to dismiss a pleading that specified only a general time period in which an alleged misrepresentation was made, involved statements memorialized in documents so that the need for specificity was not as great as it might otherwise be. (Defs.' Rep. Mem. of Law in Supp. of Mot. to Dismiss at 7.) However, there is no evidence that the cases turned on this distinction nor do defendants cite any authority that they did. Even if such a factor were relevant, the court notes that plaintiffs charge that the misrepresentations in this action occurred during negotiations via e-mail and fax in addition to by phone and, therefore, are presumably sufficiently memorialized to be capable of retrieval at some later date as well. (*See* Am. Cons.Cplt. ¶ 24.)

As to the locations where the statements were made, the plaintiffs have specified that the statements were made in Connecticut to parties in Texas. (*See* Am. Cons.Cplt. ¶ 24.) No more is necessary under Rule 9(b), F.R. Civ. P. Lest the Second Circuit's exhortation that Rule 9(b), F.R. Civ. P. be read in conjunction with Rule 8(a), F.R. Civ. P., requiring "a short and plain statement of the claim" for relief, be ignored, *see DiVittorio v. Equi-*

*dyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987), "dates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the defendant on notice as to the circumstances of the charged misrepresentations." *Harris,* 757 F.Supp. at 174; *see also Int'l Motor Sports Group, Inc. v. Gordon,* No. 98 Civ. 5611, 1999 WL 619633, at *3 (S.D.N.Y. Aug.16, 1999) (Mukasey, J.).

Defendants further argue that plaintiffs have failed to allege facts demonstrating that any of the alleged statements were false. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 12.) Plaintiffs have alleged that defendants are accomplished practitioners of death spiral convertible schemes. (*See* Am. Cons.Cplt. ¶¶ 15, 20.) Plaintiffs have described in some detail the typical pattern such financing schemes follow, making reference to how defendants manipulate the stock of the target company, using short sales and toxic convertible arrangements to turn a large profit while driving the price of the company's stock lower and lower. (*See* Am. Cons.Cplt. ¶ 19.) Plaintiffs have also listed companies which they believe to be the casualties of a long history of stock manipulation and fraud committed by defendants and of which defendants had knowledge. (*See* Am. Cons.Cplt. ¶¶ 17, 28.) Finally, plaintiffs allege that ITIS was the victim of one such unlawful scheme perpetrated by defendants. (*See* Am. Cons.Cplt. ¶ 20.) Accepting these allegations as true, as the court must, the falsity of defendants' alleged statements that they would never manipulate ITIS stock in order to depress its price, that ITIS stock would be acquired for investment purposes and not for distribution or resale, and that other companies funded by defendants or their associates enjoyed increases in stock price is readily apparent. Plaintiffs have not resorted to conclusory allegations character-

izing defendants' statements as untrue without providing any specifics as to how they were deceptive. Since plaintiffs "need not *prove* their claims at this point ... [but] only need to *allege* the reasons why the statements were fraudulent," *In re Ashanti Goldfields Securities Litigation*, 184 F.Supp.2d 247, 258 (E.D.N.Y. 2002), they have satisfied the pleading requirements of Rule 9(b), F.R. Civ. P.

*(2) Scienter and Reliance*

■ Defendants argue that the Amended Consolidated Complaint fails to plead scienter and reliance to the satisfaction of the PSLRA's heightened pleading requirements. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 12–17.) Plaintiffs base their first claim for relief on § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, passed pursuant to § 10(b). (*See* Am. Cons.Cplt. ¶¶ 36–44.) Section 10(b) makes it unlawful to use "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities, 15 U.S.C. § 78j(b), while Rule 10b–5 specifies what qualifies as a deceptive or manipulative practice. In particular, Rule 10b–5 states, among other things, that "[i]t shall be unlawful for any person ... [t]o employ any device, scheme, or artifice to defraud ... [or][t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

■ To formulate a claim pursuant to § 10(b) and Rule 10b–5, a plaintiff must allege that, in connection with the sale or purchase of securities, the defendant made a false statement or omitted material information, that defendant, in so doing, acted with scienter, and that plaintiff relied upon the defendant's misrepresentations to his detriment. *Press v. Chem. Inv. Serv. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). To show scienter or the necessary state of mind in an action pursuant to § 10(b) and Rule 10b–5, the plaintiff must allege that the defendant acted with "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (internal quotations omitted). In the Second Circuit, intent of this nature can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168–69 (2d Cir.2000) (quoting *Shields*, 25 F.3d at 1128). The PSLRA, which requires that a plaintiff plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78(u)–4(b)(2), basically codified these two methods for demonstrating scienter and, in so doing, raised pleading requirements to a level commensurate with those long in place in the Second Circuit. *See, e.g., Press*, 166 F.3d at 537–38 ("The Private Securities Litigation Reform Act of 1995 heightened the requirement for pleading scienter to the level used by the Second Circuit."); *Kalnit*, 264 F.3d at 138 ("The PSLRA's language echoed this Court's scienter standard."); *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir.2000) ("the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit"), *cert. denied* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

Plaintiffs try to plead scienter in this case by alleging that the structure of the financing agreement between ITIS and Cootes Drive provided defendants with motive and opportunity to defraud ITIS. (*See* Am. Cons.Cplt. ¶¶ 28, 42.) To successfully plead a claim along these lines,

"[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields,* 25 F.3d at 1130.

Contrary to plaintiffs' allegations, defendants contend that they did not stand to gain from any manipulation of ITIS stock. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 13–15.) They argue that it was in defendants' economic interest for ITIS stock to appreciate, not depreciate. (*Id.* at 13.) Specifically, they point out that Cootes Drive negotiated for multiple warrants entitling it to purchase hundreds of thousands of shares of ITIS common stock at an exercise price of $3.56 per share, warrants that would be useless if the common stock, which was trading at $3.35 per share on May 11, 2000, the day the warrants were issued, did not appreciate above $3.56. (*Id.* at 14.) Aside from the warrants, defendants argue that they were in a position to profit from an upturn in ITIS stock more than they would from a decline since preferred stock would be converted at the lesser of $3.2375 and 80% of the average of the three lowest per share market values during the twenty consecutive trading days before conversion. (*Id.*) Plaintiffs dispute these assertions, arguing that defendants had opportunity and motive to depress the price of ITIS stock, first, because it would excuse defendants from funding the $25 million equity line that was conditioned on the stock trading at or above $1.50 and, second, because it would allow defendants to receive additional shares on conversion which they could then sell at a profit. (Pls.' Mem. of Law in Supp. of Mot. to Dismiss at 10.)

Whether scienter exists is generally a question of fact, *Grandon,* 147 F.3d at 194, so much so that "[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press,* 166 F.3d at 538. Even though a plaintiff may barely allege motive and opportunity, that is adequate since "[t]o require more … would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual." *Id.* (citations omitted). Turning to the facts at hand, defendants' contention that they stood to profit from an increase in the stock price of ITIS shares, either through warrants or favorable conversion terms, does not foreclose the possibility that they stood to gain even more from a decline in the price of ITIS stock. Defendants were in a position to profit considerably from short sales in ITIS stock in a declining market on account of their ability to cheaply obtain additional shares of common stock upon conversion with which to cover their short positions. This is all the more the case when one considers that defendants may not have needed to cover their short positions at all assuming a severe enough drop in price. In addition, defendants would be excused from funding the $25 million equity line once the stock price dipped below $1.50, even if, as defendants point out, ITIS could only draw on the equity line in small increments. (*See* Defs.' Rep. Mem. of Law in Supp. of Mot. to Dismiss at 9.) As such, the economics involved, despite their assertions to the contrary, gave defendants an incentive to manipulate ITIS stock. On similar facts, in *Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* No. 99 Civ. 342, 1999 WL 544708, at *9 (S.D.N.Y. Jul.27, 1999) (Cote, J.), the court found that allegations by the plaintiffs that the defendants had an incentive to short-sell stock due to a favorable conversion ratio, that they could do so without detection, and that they had a

long history of orchestrating similar schemes in other companies that they had financed, satisfied the burden for pleading scienter in the Second Circuit. *See also Parnes*, 2001 WL 1658275, at *6 (scienter deemed sufficiently plead, over defendants' arguments that no economic motive was present, where complaint alleged that defendants engaged in a short-sale scheme consisting, in part, of defendants' efforts to drive down the price of the stock to gain an increased number of shares upon conversion). Given these considerations, plaintiffs have carried their burden of pleading scienter.

 Defendants next argue that plaintiffs could not justifiably rely on the alleged misrepresentations to the extent that such misrepresentations were contradicted by the terms of the written agreements entered into by the parties. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 15–17.) Generally, reasonable reliance must be proven as an element of any securities fraud claim. *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996). That said, a plaintiff bringing a federal securities fraud claim, under ordinary circumstances, need only plead that he relied on misrepresentations made by the defendant to survive a motion to dismiss since the reasonableness of his reliance implicates factual issues whose resolution would be inappropriate at this early stage. *Bonacci v. Lone Star Int'l Energy, Inc.*, No. 98 Civ. 0634, 1999 WL 76942, at *2 (S.D.N.Y. Feb. 16, 1999) (Baer, J.). There are, of course, circumstances in which reliance may be unreasonable as a matter of law but these are limited to situations where the statements relied upon are explicitly contradicted by a written agreement between the parties involved. *Id. See also Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170 (S.D.N.Y.1988) (Kram, J.) (reliance on statements that were clearly contradicted by offering memorandum lan-

guage cannot form basis for a securities fraud claim).

Defendants argue that this last principle of law effectively operates to defeat any claims by plaintiffs that they reasonably relied on defendants' alleged misrepresentations. In particular, the defendants argue that, since the written agreements between the parties clearly established that the $25 million equity line was not unconditional, in addition to allowing defendants to dispose of ITIS shares at any time and to engage in short sales in general, the plaintiffs were not entitled to rely on any prior oral representations to the contrary. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 15–16.)

More fundamentally, however, plaintiffs have also charged that defendants assured them that they would never manipulate ITIS stock so as to depress its price, that Southridge expected to make a 10% profit from funding ITIS, that Southridge was an accredited investor capable of satisfying a $28 million funding commitment, that other companies funded by entities associated with the defendants experienced increases in stock price, and that no active lawsuits were pending against defendants. (Am. Cons.Cplt.¶¶ 25(c), (e)-(f), (h)-(i).) Defendants do not, in principal, argue that these statements could not have been relied upon by plaintiffs because they were contradicted by the express terms of the written agreements. Rather they argue that plaintiffs have not alleged facts demonstrating the falsity of these statements. (*See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 16–17.) This argument is unpersuasive as it is still the case that nothing in the written agreements explicitly contradicted these statements and thereby made reliance upon them unreasonable as a matter of law. In the absence of such contradiction, plaintiffs have satisfied the necessary element of reliance sim-

ply by pleading it, irrespective of whether they have demonstrated the falsity of the statements relied upon. *See Bonacci,* 1999 WL 76942, at *2. Nor does the fact that defendants have identified some statements that they argue have been contradicted by the written agreements upset this conclusion as the statements they identify form only a subset of all statements that plaintiffs claim to have relied upon to their detriment. *See, e.g., Gabriel Capital, L.P. v. NatWest Finance, Inc.,* 94 F. Supp 2d 491, 507–08 (S.D.N.Y.2000) (Scheindlin, J.) ("Although [defendants] do identify several contradictions between earlier representations and the Offering Memorandum, their list is by no means exhaustive. Plaintiffs have identified a number of allegedly false representations . . . that are not contradicted by the Offering Memorandum. . . . As a result, plaintiffs could justifiably rely on those representations.") Accordingly, plaintiffs' first claim for relief will not be dismissed.

*(3) Market Manipulation*

 Plaintiffs' second claim for relief alleges stock manipulation in violation of § 10(b) and Rule 10b–5. (*See* Am. Cons.Cplt. ¶¶ 45–49.) Defendants contend that the second claim should be dismissed because it lacks specificity and fails to state a claim upon which relief may be granted. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 17–21.) The essence of a market manipulation claim is the allegation of conduct intended to deceive or defraud investors by conditioning or artificially affecting the market for securities. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). As a general matter, market manipulation claims are subject to a more relaxed pleading standard than other claims involving alleged affirmative misrepresentations. "The degree of particularity required for pleading a market manipulation scheme is not as demanding as it is when Rule 9(b) is

applied in other instances of fraud because the facts relating to a manipulation scheme are often known only by the defendants." *Baxter v. A.R. Baron & Co., Inc.,* No. 94 Civ. 3913, 1996 WL 586338, at *8 (S.D.N.Y. Oct.11, 1996) (Koeltl, J.); *see also SEC v. U.S. Envtl., Inc.,* 82 F.Supp.2d 237, 240 (S.D.N.Y.2000) (Leisure, J.); *T.H.C., Inc. v. Fortune Petroleum Corp.,* Nos. 96 Civ. 2690, 96 Civ. 2691, 1999 WL 182593, at *3 (S.D.N.Y. Mar.31, 1999) (Batts, J.); *In re Blech Sec.,* 928 F.Supp. at 1290–91. This does not mean that market manipulation claims can be entirely free of specifics. To be sure, Rule 9(b), F.R. Civ. P. still applies but the requirements for what must be plead are less stringent than they otherwise would be. At a minimum, it is "clear that a market manipulation claim must still specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *T.H.C., Inc.,* 1999 WL 182593, at *3 (quoting *Baxter v. A.R. Baron & Co., Inc.,* No. 94 Civ. 3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct.12, 1995) (Koeltl, J.)). This much the plaintiffs in this case have done.

The plaintiffs have adequately detailed what manipulative acts the defendants have undertaken against them. For example, they have described how defendants manipulated the price of ITIS stock by "dumping a large volume of stock on the market," by employing "pre-arranged sales" and "short sales," "covering short positions," and "painting the tape." (Am. Cons.Cplt.¶ 47.) They have listed specific short sales by defendant Thomson Kernaghan and provided dates and the number of shares sold short for each trade. (Am. Cons.Cplt.¶ 31.) They have described the effect that such activity has had on the market for ITIS stock, namely that it has artificially depressed the price of ITIS stock to the benefit of defendants and detriment of plaintiffs. (Am.Cons.Cplt.¶ 34.)

Notwithstanding these pleadings, defendants argue that the second claim should be dismissed because plaintiffs have failed to distinguish the role of each defendant, beyond that of Thomson Kernaghan, in the alleged market manipulation. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 18–19.) Assuming for the moment that plaintiffs' pleading is susceptible to this characterization, plaintiffs have also alleged that Thomson Kernaghan acted on behalf of itself and the other defendants in perpetrating this market manipulation and, in particular, that Thomson Kernaghan acted as an agent for Cootes Drive. (*See* Am. Cons.Cplt. ¶¶ 31–32.) Therefore, since plaintiffs have alleged this concrete connection between Thomson Kernaghan and the other defendants, the fact that defendants' roles are not distinguished from each other to a greater degree is forgivable at this early stage. *Cf. In re Blech Sec.*, 928 F.Supp. at 1291 ("[T]o the extent that [the] Defendants' roles are not distinguished from each other, the inextricable linkage among them in the management of Blech & Co. excuses such a blurring of roles at this juncture.").

Alternatively, defendants argue that plaintiffs' second claim must fail because plaintiffs have not plead reliance and damages, both essential elements of any stock manipulation claim under § 10(b). (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 20.) *See Global Intellicom*, 1999 WL 544708, at *7. There is no merit, however, to this contention as plaintiffs have clearly carried their burden of pleading reliance and damages. In particular, the second claim alleges that "[t]he individual plaintiffs were damaged by the defendants' manipulation, because all bought or sold stock during the time when the stock price was artificially depressed by that manipulation, in reasonable reliance on the market price for [ITIS] stock." (Am.Cons.Cplt.¶ 49.)

In view of these assertions, the second claim alleging stock manipulation will not be dismissed.

*(4) Control Person Liability*

 Plaintiffs' third claim for relief seeks to hold defendants Pickett, Hicks, Valentine, Southridge, TK Holdings, and Thomson Kernaghan liable under § 20(a) of the Exchange Act. (*See* Am. Cons.Cplt. ¶¶ 50–51.) Section 20(a) provides that any person who, either directly or indirectly, controls another person liable for a securities violation can himself be held jointly and severally liable. *See* 15 U.S.C. § 78t(a). Three elements are necessary to establish a prima facie case of liability under § 20(a). A plaintiff must show: (1) a primary violation by a controlled person; (2) that defendant had control of the primary violator; and (3) that the defendant/controlling person was, to some meaningful extent, a culpable participant in the wrong committed by the primary violator. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (citing *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)). Defendants argue that plaintiffs have failed to satisfy these elements insofar as they have not alleged a valid primary violation or facts showing that any defendant/controlling person is a culpable participant in a wrong committed by a person under his control. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 21–22.) Since the court has already concluded that plaintiffs have alleged a primary violation in their first or second claims for relief, it need focus its analysis only on defendants' latter argument involving plaintiffs' alleged failure to satisfy the "culpable participant" prong of a control person liability claim.

After reviewing the arguments presented by both sides, it is clear to the court that plaintiffs have failed to make out a claim for control person liability. Plaintiffs' third claim for relief, unlike all the

other claims, does not incorporate all prior paragraphs of the Amended Consolidated Complaint. (*See* Am. Cons.Cplt. ¶¶ 50–51.) As a result, the court is limited to considering only the paragraphs alleged in the third claim to determine whether plaintiffs have a viable claim. Those paragraphs do little to provide the facts necessary to support a control person liability claim as they are predominantly conclusory in nature. In response, plaintiffs argue that they are not required to plead facts in support of a control person liability claim, relying on a recent United States Supreme Court employment discrimination decision, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). (Pls.' Mem. of Law in Supp. of Mot. to Dismiss at 13–14.) However, plaintiffs' reliance on *Swierkiewicz* is misplaced as the decision does not address control person liability in any way and the Second Circuit has clearly ruled that a plaintiff must adduce facts showing culpable participation in order to establish a prima facie case of control person liability. While, at one time, one line of cases in the Second Circuit had held that it was not necessary to make more than an allegation of control person status to make out a prima facie case, *see, e.g., Baxter*, 1996 WL 586338, at *6; *Food &*

*Allied Serv. Trades Dep't., AFL–CIO v. Millfeld Trading Co., Inc.*, 841 F.Supp. 1386, 1390 (S.D.N.Y.1994) (Sand, J.), the Court of Appeals, in *First Jersey*, 101 F.3d at 1472, and later in *Boguslavsky*, 159 F.3d at 720, parted ways from that line of precedent to clarify that culpable participation in addition to control person status must be shown to make out a prima facie case of control person liability. *See, generally, Dietrich v. Bauer*, 126 F.Supp.2d 759, 764 n. 3 (S.D.N.Y.2001) (Sweet, J.) (explaining the evolution). To the extent plaintiffs argue otherwise, they are inveighing for a view that, while once true, no longer has any authority in the Second Circuit. Accordingly, plaintiffs' third claim for relief alleging control person liability is dismissed with leave to amend.[2]

### (5) Texas State Law Claims

Plaintiffs base their fourth, fifth, and sixth claims for relief on violations of Texas securities laws. (*See* Am. Cons. Cplt. ¶¶ 52–62.) Defendants argue that these claims must be dismissed because all the written agreements between the parties specify that New York law shall govern all disputes and provide for their resolution in a New York forum.[3] (*See* Mazin Aff. Exh. A, § 4.8; Exh. B, § 6(k); Exh.

---

2. The decision as to whether to grant leave to amend is committed to the sound discretion of the district court, *see In re Independent Energy Holdings PLC Securities Litigation*, 154 F.Supp.2d 741, 773, and such leave "shall be freely given when justice so requires." Rule 15(a), F.R. Civ. P. Plaintiffs need not be granted leave to amend where it is apparent that amendment would be futile, *see In re Independent Energy*, 154 F.Supp.2d at 773, but "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus.*, 949 F.2d at 48. Given these considerations, plaintiffs are entitled to such leave with regard to their third claim for relief. *See In re Deutsche Telekom AG Securities Litigation*, No. 00 Civ. 9475, 2002 WL 244597, at *8 (S.D.N.Y. Feb.20, 2002) (Stein, J.) (dismissing without prejudice plaintiffs' control person

claims for failure to allege the prima facie elements of such a claim).

3. For example, § 8.1 of the Stock Purchase Agreement, in pertinent part, provides:

*Governing Law.* All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transac-

E, §§ 8.1, 8.6; and Exh. F, § 14.) (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 22–23.) The court agrees.

In *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304 (2d Cir.1994), the Court of Appeals held that a choice-of-law and forum selection provision—specifying that all disputes "arising out of or relating to" the agreement between the parties shall be governed by New York law and evidencing the parties' submission to the exclusive jurisdiction of New York courts— compelled the construal of plaintiffs' common law fraud claim under New York law, not Texas law as the plaintiffs there had argued. *Turtur*, 26 F.3d at 309–10. Nonetheless, the plaintiffs in this case rely on *Krock v. Lipsay*, 97 F.3d 640 (2d Cir. 1996) to argue that a choice-of-law provision, standing alone, does not conclusively determine which law will govern a claim of fraud arising incident to the contract since such a claim represents a non-contractual cause of action. While *Krock* does stand for this proposition, its application to the present case is inapposite as the provision at issue in *Krock* was much narrower and stated only that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts," and could not, therefore, be read broadly enough to bring a claim of fraudulent representation within its ambit. *Krock*, 97 F.3d at 643, 645. Unlike *Krock*, the provision in this case, in addition to the choice-of-law provision, contains a forum selection clause that purports to cover all disputes arising out of or in connection with the Stock Purchase Agreement. This distinction was crucial to the court's reasoning in *About.Com, Inc. v. Targetfirst, Inc.*, No. 01V1665, 2002 WL 826953 (S.D.N.Y. Apr.30, 2002) (Daniels, J.), which

tion contemplated hereby or discussed herein (including with respect to the enforcement of the any [sic] of the Transaction Documents)....

also distinguished *Krock*, as containing a much narrower choice-of-law provision, from *Turtur*. In particular, in *About.Com* it was noted that the provision in *Krock* contained no accompanying forum selection clause employing "arising under" or "relating to" language, in contrast to the provision at issue in the case which contained a New York forum selection clause much like the one in *Turtur*. *See About. Com*, 2002 WL 826953, at *2. As a result, it was held that New York law should govern defendant's fraud counterclaim, not California law as the defendant had argued. *Id. See also Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026, 1999 WL 301691, at *6 (S.D.N.Y. May 12, 1999) (Ward, J.) (New York choice-of-law provision held sufficiently broad to encompass plaintiff's tort-based claims); *Malon Resources Corp. v. Midland Bank*, No. 96 Civ. 7458, 1997 WL 403450, at *3 (S.D.N.Y. Jul.17, 1997) (Patterson, J.) (same). Accordingly, plaintiffs' fourth, fifth, and sixth claims for relief are dismissed with prejudice.

### (6) Common Law Fraud

■ Plaintiffs' seventh claim for relief alleges that defendants Hicks, Pickett, Constabile, and Southridge committed common law fraud. (*See* Am. Cons.Cplt. ¶¶ 63–65.) Since plaintiffs have satisfied the elements for pleading a § 10(b) and Rule 10b–5 violation, they have also fulfilled the requirements for pleading common law fraud, as they are basically identical. *See T.H.C., Inc.*, 1999 WL 182593, at *5; *Scone Investments, L.P. v. American Third Market Corp.*, No. 97 Civ. 3802, 1998 WL 205338, at *10 (S.D.N.Y. Apr.28, 1998) (Scheindlin, J.) ("the elements of common law fraud are essentially the same as those which must be pleaded to establish a claim

(Mazin Aff. Exh. E, § 8.1.)

under § 10(b) and Rule 10b–5"). Accordingly, the court will not dismiss plaintiffs' seventh claim for relief.

### (7) Civil Conspiracy

 Plaintiffs' eighth claim for relief is for civil conspiracy. (*See* Am. Cons.Cplt. ¶¶ 66–67.) It is well-settled that New York law does not recognize an independent cause of action for civil conspiracy. *See Global Intellicom*, 1999 WL 544708, at *17; *Briarpatch Ltd., L.P. v. Pate*, 81 F.Supp.2d 509, 516 (S.D.N.Y.2000) (Sweet, J.). While New York law does recognize a derivative cause of action for civil conspiracy that is predicated on another tort, *see Global Intellicom*, 1999 WL 544708, at *17, the plaintiffs in this case have not brought one. (*See* Am. Cons.Cplt. ¶¶ 66–67; Pls.' Mem. of Law in Supp. of Mot. to Dismiss at 15.) As a result, plaintiffs' eighth claim for relief is dismissed with prejudice.

### (8) Breach of Contract

 Plaintiffs' ninth claim for relief alleges that Cootes Drive breached a written agreement between the parties by refusing to honor its financing obligations and by committing violations of the securities laws. (*See* Am. Cons.Cplt. ¶¶ 68–72.) Defendants counter that the Amended Consolidated Complaint fails to state a claim for breach of contract because there is no provision in the written agreements that prohibits Cootes Drive from violating the securities laws and under the terms of the Stock Purchase Agreement one of the conditions precedent to Cootes Drive fulfilling its funding commitment was never met. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 25–27.)

 A claim for breach of contract, under New York law, must allege: 1) the existence of an agreement between the parties; 2) adequate performance of the contract by plaintiff; 3) breach of the contract by defendant; and 4) damages result-

ing from the breach. *Harsco Corp.*, 91 F.3d at 348; *Bridgeway Corp. v. Citibank, N.A.*, 132 F.Supp.2d 297, 305 (S.D.N.Y. 2001) (Chin, J.). Furthermore, Rule 9(c), F.R. Civ. P. provides that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred." *See also Global Intellicom*, 1999 WL 544708, at *18 (citing *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 243 (S.D.N.Y. 1997)).

In view of these requirements, plaintiffs have fulfilled all the elements of a claim for breach of contract. They allege that ITIS and Cootes Drive "are parties to a certain financing agreement," that ITIS has "performed its obligations under that agreement, or is excused from performing because of Cootes's breach," that "Cootes breached that agreement by failing and refusing to honor its financing obligations and by violating the securities laws," and, finally, that "Cootes's breach has damaged [ITIS]." (Am.Cons.Cplt.¶¶ 69–72.) It is no defense to argue, as the defendants have, that they are excused from performing their obligations under the agreement because a condition precedent has not occurred since Rule 9(c), F.R. Civ. P. requires no more than a general statement by a plaintiff that all conditions precedent have been satisfied to successfully make out a claim. Plaintiffs have included such a statement in their Amended Consolidated Complaint, namely that "[ITIS] performed its obligations under [the] agreement." (Am.Cons.Cplt.¶ 70.) Accepting the allegations of the complaint as true and drawing all inferences in favor of the plaintiff, as the court must, plaintiffs have, therefore, sufficiently alleged a claim for breach of contract. Moreover, since plaintiffs' breach of contract claim is premised on defendants' refusal to honor its financing obligations after ITIS had adequately performed in addition to violations of secu-

rities laws, it is enough for the court to uphold the claim on grounds that it adequately pleads the fulfillment of a condition precedent without reaching the issue of whether the alleged violation of the securities laws by the defendants is sufficient to make out a claim for breach of contract under the written agreements between the parties. Accordingly, the court will not dismiss plaintiffs' ninth claim for relief.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Amended Consolidated Complaint is granted in part and denied in part. The fourth, fifth, and sixth claims for relief alleging violations of Texas securities laws as well as the eighth claim for relief alleging civil conspiracy are dismissed with prejudice. The third claim for relief alleging control person liability is dismissed without prejudice. Plaintiffs are granted leave to replead only this third claim by Aug. 16, 2002. As to the remaining claims—the first claim for relief alleging misrepresentation in violation of § 10(b) and Rule 10b–5 of the federal securities laws, the second claim for relief alleging stock manipulation, the seventh claim for relief alleging common law fraud, and the ninth claim for relief alleging breach of contract—defendants' motion to dismiss is denied. Furthermore, the automatic stay of discovery granted pursuant to the PSLRA, 15 U.S.C. § 78u–4(b)(3)(B) during the pendency of a motion to dismiss the complaint, is hereby dissolved and discovery in this matter is ordered to resume immediately upon receipt of this opinion. The court is fully prepared to assist the parties in moving this case forward to trial without undue delay.

**IT IS SO ORDERED.**