**Keith JONES, D & K Charitable Foundation, and Daniel Borislow, Plaintiffs,**

v.

**INTELLI–CHECK, INC., Frank Mandelbaum, Paul Cohen, Edwin Winiarz, and W. Robert Holloway, Defendants.**

Civil Action No. 01–CV4860(FLW).

United States District Court, D. New Jersey.

July 30, 2003.

Louis R. Moffa, Jr., Schnader Harrison Segal & Lewis LLP, Cherry Hill, NY, Rolin P. Bissell, Jonathan S. Liss, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for plaintiffs.

Allyn Z. Lite, Lite DePalma Greenberg & Rivas, LLC, Newark, NJ, Francis P. Karam, Elizabeth A. Berney, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for defendants.

## OPINION

WOLFSON, District Judge.

Presently before the Court is the motion of defendants, Intelli–Check, Inc. ("Intelli–Check" or "IDN" or the "Company"), Frank Mandelbaum, Paul Cohen, Edwin Winiarz, and W. Robert Holloway, to dismiss plaintiffs' Second Amended Complaint alleging violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. For the reasons set forth below, defendants' motion to dismiss is granted, though plaintiffs are given leave to file an amended complaint on certain of the claims as set forth herein.

## I. FACTUAL BACKGROUND

Plaintiffs, Keith Jones, Daniel Borislow, and the D & K Charitable Foundation,[1] seek redress for approximately $2,000,000 in losses incurred when they short sold defendant IDN's stock. Second Amended

---

1. D & K Charitable Foundation was formed by plaintiff Borislow. Second Amended Complaint at ¶ 7.

Complaint at ¶¶ 7, 8. Short selling, as explained by the Third Circuit Court of Appeals,

> is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make this covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to the stock's price, there is no limitation on the short seller's risk. There is no time limit to this obligation to cover.

*Zlotnick v. TIE Communications,* 836 F.2d 818, 820 (3d Cir.1988). In other words, a short seller borrows shares from a broker and immediately sells them to a buyer; this transaction is the "short sale." The short seller is obligated to purchase the same number of shares to return to the broker at any later date in the future; this transaction is the "covering purchase." If the stock price drops in the time between the short sale and the covering purchase, the short seller profits. If instead the stock price rises, the short seller suffers a loss.

Defendant IDN manufactures and markets a product known as ID–Check, which enables a retailer to verify driver licenses and other forms of government-issued identification. Second Amended Complaint at ¶¶ 17–18. Believing the price of IDN stock was overvalued, plaintiffs short sold a total of 215,300 shares from February 23, 2001 through September 20, 2001. *Id.* at ¶ 1. The stock price, however, did not drop as plaintiffs had expected. Rather, the price rose substantially, so much so that plaintiffs lost a total of $2,000,000 when they made their covering purchases from October 18, 2001 through January 3, 2002. *Id.* Plaintiffs allege that defendants engaged in securities fraud through a series of actions designed to artificially inflate the price of IDN's stock, thereby causing plaintiffs' losses. *Id.* The individual defendants are sued in their following capacities with the Company: Frank Mandelbaum as Chairman of the Board and Chief Executive Officer; Edwin Winiarz as Chief Financial Officer, Senior Executive Vice President, Treasurer and director; W. Robert Holloway as Senior Executive Vice President; and Paul Cohen as director. *Id.* at ¶¶ 12–15.

### A. Plaintiffs' Decision to Short Sell IDN's Stock

Plaintiffs allege that the reason they decided to short sell IDN's stock was because they noticed in IDN's filings with the SEC that for the first and second quarters of 2001, the Company's reported revenues came largely from previous sales instead of new sales. Second Amended Complaint at ¶¶ 28–41. Under IDN's new policy of "deferred revenue recognition," revenues from sales in the fourth quarter of 2000 would be recognized ratably over the following year. *Id.* at ¶ 29. This was possible because after IDN's sale of its product to a customer, it provided the customer with post-contract service and support. *See id.* Up until the start of the fourth quarter 2000, IDN recognized all of

its revenue at the time the product was sold; the Company thereafter changed its policy by recognizing revenue ratably over the course of the one-year period following the sale. *See id.* Defendants analogize the difference between the revenue recognition policies to magazine subscriptions: a publisher could recognize revenue of a one-year subscription at the time the sale is made, or ratably over the course of the year when each month's magazine is delivered. Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Def.Br.") at 12 n. 6.

Plaintiffs believed IDN's newly-adopted revenue recognition policy gave the false impression that IDN's sales were increasing when in fact they were, at some points, decreasing. For example, as described in more detail below, IDN reported in a press release that its first quarter 2001 revenues were $204,635, compared with $30,218 for the first quarter 2000. Second Amended Complaint at ¶ 33. Plaintiffs considered this misleading because (as IDN disclosed in its 10–QSB for the first quarter 2001) $180,984 of that revenue included revenue that was deferred from previous sales. *Id.* at ¶ 31. Thus, sales had actually decreased $23,651 from the first quarter of 2000 to the first quarter of 2001. *See id.* Plaintiffs considered this a misleading accounting technique that artificially inflated the price of IDN's stock. *Id.* at ¶ 40. They "believ[ed] that eventually IDN would not be able to rely on the use [of] deferred revenues" to overstate the Company's growth, and that the stock price would in time drop as other investors realized it was overvalued. *See id.* at ¶ 41. According to plaintiffs, this was the reason they decided to short sell IDN's stock. *Id.*

Plaintiffs allege that they came to the conclusion that IDN was using a misleading accounting technique by analyzing the following three filings with the Securities and Exchange Commission ("SEC") and two press releases: Form 10–KSB for the period ended December 31, 2000 (filed March 31, 2001 and amended October 9, 2001); the May 9, 2001 press release; Form 10–QSB for the period ended March 31, 2001 (filed May 14, 2001 and amended on August 23, 2001); Form 10–QSB for the period ended June 30, 2001 (filed August 13, 2001); and the August 13, 2001 press release. These documents are discussed in turn below.

### 1. Form 10–KSB for the Period Ended December 31, 2000

IDN filed its Form 10–KSB for the period ended December 31, 2000 on March 31, 2001, and amended it on October 9, 2001. As plaintiffs allege, this filing announced IDN's new revenue recognition policy:

> Revenue on sales of the Company's product is recognized upon shipment to the customer. Certain sales require continuing service or post contract customer support and performance by the Company, and accordingly a portion of the revenue is deferred and recognized ratably over the period in which the future service, support and performance are provided, which is generally one year. Currently, if the Company does not have enough experience to identify the fair value of each element, the full amount of the revenue and related gross margin is deferred and recognized ratably over the one-year period in which the future service, support and performance are provided.

> . . . . .

> ... Revenues of $517,950 from sales in the fourth quarter of 2000, as well as cost of revenues of $299,040, were deferred in accordance with the Securities and Exchange Commission's Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements."

The deferred revenue and the related cost of revenue will be recognized ratably over a 12 month period....

Second Amended Complaint at ¶ 29. Plaintiffs do not allege that this filing contained any misleading information.

### 2. May 9, 2001 Press Release

On May 9, 2001, five days before IDN filed its 10–QSB for the first quarter of 2001, it issued a press release highlighting the results of the quarter. The press release stated:

INTELLI–CHECK, INC. (AMEX IDN),[2] a developer of advanced document verification systems, announced today financial results for the first quarter ended March 31, 2001, with revenues increasing to $204,635 compared with $30,218 for the first quarter of 2000.

*Id.* at ¶ 33. In the release, Defendant Frank Mandelbaum, Chairman and CEO of IDN, was quoted as saying:

This is the second consecutive quarter that Intelli–Check has reported significant increases in revenues for its state-of-the-art ID–Check unit ... During the first quarter of 2001, Intelli–Check shifted its marketing focus to national accounts, which are expected to contribute

to further growth during the remainder of the fiscal year....

*Id.* Plaintiffs allege these statements were misleading because sales actually decreased from the first quarter of 2000 to the first quarter of 2001.[3] *Id.*

### 3. Form 10–QSB for the Period Ended March 31, 2001

IDN filed its Form 10–QSB for the period ended March 31, 2001 on May 14, 2001, and amended it on August 23, 2001. This filing listed the same figures announced in the May 9, 2001 press release. *See id.* at ¶ 31. It stated, in relevant part: "[r]evenues increased substantially from $30,218 for the first three months ended March 31, 2000 to $204,638 recorded for the three months ended March 31, 2001." Declaration of Francis P. Karam in Support of Defendants' Motion to Dismiss ("Karam Dec.") at Ex. D, p. 5.[4] As defendants point out, the same paragraph states:

... Revenues for the period ended March 31, 2001 includes [sic] $180,984 of sales deferred during the prior 12 month period. Sales for the period was [sic] minimal due to the recent refocus of our marketing efforts towards the larger retail market, in which the sales cycle requires an extended time frame involv-

---

**2.** "AMEX IDN" indicates that Intelli–Check's common stock is listed on the American Stock Exchange under the symbol IDN. *See id.* at ¶ 11.

**3.** The Court notes an inconsistency in plaintiffs' Second Amended Complaint regarding the timing of their decision to short sell IDN's stock. Plaintiffs explain that they decided to acquire their short positions because they believed IDN's misleading comparison of current revenues to prior sales artificially inflated the stock price. *Id.* at ¶ 41. The first instance of this allegedly misleading comparison is the May 9, 2001 press release. Yet, plaintiffs began to short IDN's stock on February 23, 2001, approximately ten weeks before the press release. *See id.* at ¶ 25. Even

if plaintiffs could somehow foretell from reading the announcement of IDN's new revenue recognition policy that IDN would later misleadingly compare current revenues with prior sales, that announcement was first made in IDN's Year 2000 10–KSB, filed March 29, 2001—over a month *after* plaintiffs began shorting the stock. *See id.* at ¶ 29.

**4.** As discussed below in section III.A, in deciding a motion to dismiss, a district court may consider documents relied upon or referred to in the complaint. *In re: Donald J. Trump Casino Securities Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993). Since IDN's SEC filings are cited in the Second Amended Complaint, this Court will consider the full text of each document.

ing multiple meetings, presentations and a test period. In addition, the roll-out of Sensormatic's sales and marketing initiatives first began in April 2001. *Id.* In the same filing, IDN again reported its revenue recognition policy, using substantially the same language as in its 10–KSB for the period ended December 31, 2000. *Compare id.* at p. 3 *with* Second Amended Complaint at ¶ 29. Plaintiffs allege that this filing materially misrepresented IDN's performance during the first quarter of 2001. *See* Second Amended Complaint at ¶ 31.

### 4. Form 10–QSB for the Period Ended June 30, 2001

On or about August 13, 2001, IDN filed its Form 10–QSB for the period ended June 30, 2001. In relevant part, it stated:

Comparison of the six months ended June 30, 2001 to the six months ended June 30, 2000.

Revenues increased substantially from $47,320 for the six months ended June 30, 2000 to $474,846 recorded for the six months ended June 30, 2001. Revenues from distributors totaled $416,009 and revenues from direct customers totaled $58,837. Revenues for the period ended June 30, 2000 included initial sales of a limited number of ID–Check terminals prior to the early return of our inventory of these terminals to the manufacturer for upgrading. Revenues for the six months ended June 30, 2001 includes [sic] $219,625 of sales deferred during the prior 12–month period. Sales for the period ended June 30, 2001 were limited by the recent refocus of our marketing efforts towards the larger customers within the retail market, in which the sales cycle normally requires an extended time frame involving multiple meetings, presentations and a test period, which has been further extended by the rapid slowing of the economy,

whereby decisions for capital expenditures are being delayed. In addition, the roll-out of Sensormatic's sales and marketing initiatives first began in April 2001.

Second Amended Complaint at ¶ 36. This filing also described IDN's revenue recognition policy. Karan Dec. at Ex. F, p. 3. Plaintiffs allege that this filing materially misrepresented IDN's performance during the second quarter of 2001. Second Amended Complaint at ¶ 34.

### 5. The August 31, 2001 Press Release

On the same day IDN filed its second quarter 2001 10–QSB, it issued a press release announcing the results. The release stated, in relevant part:

INTELLI–CHECK, INC. (AMEX IDN), a developer of advanced document verification systems, announced today financial results for the second quarter ended June 30, 2001, with significant revenue increases for the quarter and six month period.

Revenues for the second quarter of 2001 increased nearly 15–fold to $270,211 compared with $17,102 for the second quarter of 2000. For the first six months of 2001, revenues rose to $474,846, a 10–fold increase, when compared with $47,320 for the year-ago period.

Second Amended Complaint at ¶ 37. Defendant Mandelbaum was quoted as saying:

Intelli–Check reported significant revenue gains even though the roll-out of our advanced ID–Check unit by our major distributor did not occur until well into the second quarter.... Our refocused marketing efforts on the larger mass market retailers requires a sales cycle with an extended time frame involving multiple meetings, presentations and

test periods, which have been further extended by current economic conditions. To date, we have already sold ID–Check units to some of the largest companies in the gaming industry and have begun to place test units in some of the largest pharmacy and grocery chains, as well as with a large tobacco company. As part of a new marketing effort, we have also begun discussions with original equipment manufacturers to license our technology for inclusion on their platforms. Additionally, we recently released our C–Link software product, which when used with our ID–Check unit enhances a retailer's ability to prevent economic loss from fraudulent transactions. We are confident that these efforts together with our past marketing focus should result in future growth.

*Id.* at ¶ 38. Plaintiffs allege that this press release materially misstated IDN's growth during the second quarter of 2001. *Id.* at ¶ 39.

## B. IDN's "Squeeze" of Plaintiffs and the Resultant "Bubble Period"

Plaintiffs allege that in the summer of 2001, IDN became aware that plaintiffs had taken significant short positions in its stock. *Id.* at ¶ 42. Because substantial short sales in a stock can have the effect of lowering the stock price, defendants allegedly set out on a plan to punish or "squeeze" plaintiffs by:

(a) failing to disclose material information that would cause IDN's stock price to drop; and

(b) suppressing the supply of IDN's stock available to be sold.

*Id.* According to plaintiffs, "the effect of these two strategies was to balloon the overvaluation into a huge, artificial bubble" stretching from late September 2001 until the filing of the Second Amended Complaint on May 31, 2002. *Id.* The allegedly improper acts of defendants are discussed in turn below.

## 1. Comparison of Prior Period "Sales" with Current Period "Revenues": Form 10–QSB for the Period Ended September 30, 2001

On November 13, 2001, IDN filed its Form 10–QSB for the period ended September 30, 2001. *Id.* at ¶ 53. As in the first and second quarter 2001 reports, the third quarter 2001 report announced an increase in revenue as compared to the same period in 2000: "[r]evenues increased $170,590 from $109,676 recorded for the three months ended September 30, 2000 to $280,266 recorded for the three months ended September 30, 2001." IDN's Third Quarter 2001 10–QSB, p. 7.[5] This filing also contained an explanation of the revenue recognition policy, *id.* at 3, but did not specify an amount of current revenues that had been deferred from previous sales, *id.* at 7. Plaintiffs allege that IDN, through its third quarter 2001 filing, "suggest[ed], wrongfully, that it was continuing to experience sales growth." Second Amended Complaint at ¶ 50.

## 2. Failure to Disclose Competition

Plaintiffs allege that IDN has never disclosed the existence of competition by VeriFone, a company that markets an identification verification product substantially similar to IDN's. *Id.* at ¶¶ 43–46. Plaintiffs contend that VeriFone has a unique advantage in the identification verification market because its technology can coexist on terminals that it has already provided

---

**5.** Though neither party submitted this filing to the Court, I will consider it for purposes of this motion to dismiss because plaintiffs refer to it in their Second Amended Complaint. *Trump Casino,* 7 F.3d at 368 n. 9.

to the global market. *Id.* at ¶ 45. As VeriFone's website explains:

VeriFone's Easy ID application enables merchants to conduct automatic age verification—right from their VeriFone point-of-sale terminal. Easy ID provides a helpful tool to enhance a merchant's overall program to prevent the sale of alcohol, tobacco and other age-restricted items to minors . . . .

Easy ID runs in VeriFone's Verix multi-application environment, meaning it can securely co-exist on the same terminal with payment and other applications.

Verix terminals with Verix Multi-app Conductor can automatically launch Easy ID when a customer's state-issued identification is swiped or scanned.

*Id.*

VeriFone first publicized its Easy ID product in a press release June 20, 2001. *Id.* at ¶ 44. Since then, IDN has not named VeriFone as a competitor in any of its public filings or statements. *Id.* at ¶ 46.

### 3. Untimely and Misleading Disclosure of the Messina Lawsuit

Kevin Messina, a former officer and director of IDN,[6] filed a lawsuit on October 19, 2001, against the Company seeking a preliminary injunction enjoining it from restricting sales of his shares of company stock. As discussed more fully in the successive section, Messina alleged that on October 12, 15, and 16, 2001, IDN improperly prevented him from selling significant blocks of his IDN stock. Second Amended Complaint at ¶ 57. On November 13, 2001, in IDN's third quarter 2001 10–QSB, IDN reported that:

On October 19, 2001, a former officer and director of the Company filed a lawsuit against the Company to force the Company to permit him to sell his restricted shares. The complaint also seeks damages of $29,350 for miscellaneous compensation and punitive damages of $3,000,000. The Company considers this former officer an "insider" subject to the rules under Section 144 of the Securities and Exchange Act of 1934. The Company feels it is acting properly and will defend itself vigorously. In addition, the Company intends to file a counter claim.

IDN's Third Quarter 2001 10–QSB, p. 9.

While plaintiffs' complaint is not a model of clarity with respect to the claims of improper disclosure of the Messina suit, the Court can discern four distinct allegations of impropriety:

i) the disclosure was late; that is, IDN should have informed the public about the suit at some point prior to November 13, 2001, *see* Second Amended Complaint at ¶ 52 and Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Pl.Br.") at 17;

ii) the disclosure was misleading because it was "inaccurate," *see* Second Amended Complaint at ¶ 53;

iii) the disclosure was misleading because it failed to specify the allegations of the dispute, *see id.* at ¶ 52; and

iv) the disclosure was misleading because it did not reveal that Messina refused to cooperate with IDN in a separate patent lawsuit, *see id.* at ¶¶ 53–54.

The patent suit was filed against IDN in August 1999 by IdentiScan, a rival company which markets a product similar to IDN's. Karam Dec. at Ex. C, p. 10. As reported in IDN's Year 2000 10–KSB, the suit involved a dispute over which compa-

---

**6.** Mr. Messina is also a former defendant in this case; plaintiffs voluntarily dismissed their claims against him on September 25, 2002.

ny held patent rights to the identification verification technology. *Id.* IDN's counsel in that suit identified Messina's "input on both our defensive case and affirmative claims against Identi–Scan as critical." Second Amended Complaint at ¶ 53. Yet on July 10, 2001, IDN's patent counsel informed the Company in writing that he had "endeavored unsuccessfully to obtain Mr. Messina's assistance" in the patent litigation. *Id.* Plaintiffs allege that because the patent was so important to IDN's business, and because Messina's input was critical to IDN's success in the suit, IDN should have disclosed that Messina did not intend to cooperate. *Id.* at ¶¶ 53–54.

### 4. IDN's Block of Messina's Sales of His Company Stock

In addition to alleging that IDN improperly disclosed the details of the Messina suit, plaintiffs claim that IDN's actions that precipitated the suit—namely, the Company's refusal to allow Messina to sell his shares on October 12, 15, and 16, 2001—amount to securities fraud. *Id.* at ¶¶ 56–58. Plaintiffs contend IDN blocked Messina's sales in order to create a "false shortage" of IDN's shares, which in turn would artificially inflate the stock price. *Id.* at ¶ 58. Plaintiffs argue this effect on the market is shown by the fact that "IDN's share price has consistently dropped following Messina's sales on January 10, 2002, April 19, 2002, and May 7, 2002." *Id.*

### 5. Rights Offering

On September 21, 2001, IDN filed a Registration Statement with the SEC an-

nouncing a rights offering for 970,076 of its shares, whereby its stockholders were to receive one non-transferable right to purchase one share of IDN's common stock at $8.50 a share for every ten outstanding shares of common stock held on March 30, 2001. *Id.* at ¶ 60. On October 5, 2001, IDN issued a press release publicizing the rights offering, which expired on October 4, 2002. *Id.* at ¶ 62. Plaintiffs allege that the rights offering harmed them because it had "the effect of increasing the cost to cover their short positions." *Id.* at ¶ 63. In addition, plaintiffs contend that IDN's Prospectus filed in connection with the rights offering incorporated by reference its Year 2000 10–KSB, and its first and second quarter 2001 10–QSBs, which included material misrepresentations concerning the overstatement of revenue and the failure to properly disclose the existence of VeriFone and the details of the Messina suit, as discussed above.[7] *Id.* at ¶ 61.

### 6. Interference with Borislow's Trading Activities

Plaintiffs dedicate only one paragraph in their Second Amended Complaint to this claim. The paragraph, in its entirety, is as follows:

> In addition to the improper activities alleged above, defendants directly or through their legal counsel have interfered with plaintiff's relationship with plaintiff's stock broker, caused an investigation by the SEC into plaintiff's trading activities, attempted to interfere with efforts by plaintiff's [sic] to cover their short positions and otherwise tar-

---

7. The Court notes that nowhere else in the Second Amended Complaint have plaintiffs asserted that IDN's Year 2000 10–KSB was misleading. As plaintiffs themselves explain, that filing simply announced IDN's new revenue recognition policy. *Id.* at ¶ 28–30. IDN did not make the allegedly misleading comparison of current revenues with prior sales until its May 9, 2001 press release announcing the results of the first quarter of 2001. *Id.* at ¶ 33.

geted plaintiffs in order to adversely impact their short positions.

*Id.* at ¶ 59.

## II. PROCEDURAL HISTORY

Plaintiff Keith Jones originally filed this suit as a class action on October 18, 2001. On November 30, 2001, plaintiff Daniel Borislow joined Jones in filing an amended complaint, which abandoned the class action. Defendant Kevin Messina and the remaining defendants filed, pursuant to Appendix N of the Local Rules of Civil Procedure, two separate Notices of Intent to submit a motion to dismiss the amended complaint on March 11, 2002. Before the Appendix N packages were submitted to the Court, plaintiffs obtained new counsel, and the parties stipulated that defendants would withdraw their motions to dismiss and plaintiffs would file a Second Amended Complaint. On May 31, 2002, plaintiffs Jones and Borislow, along with a new plaintiff, D & K Charitable Foundation, filed their Second Amended Complaint. Plaintiffs voluntarily dismissed their claims against Messina on September 25, 2002, and on October 2, 2002, the remaining defendants filed the present motion to dismiss the Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and Fed. R.Civ.P. 9(b). This matter was reassigned from the Honorable Jerome B. Simandle to me on January 8, 2003.

## III. APPLICABLE STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." A claim should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re:*

*Rockefeller Center Properties, Inc. Securities Litig.,* 311 F.3d 198, 215 (3d Cir.2002) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The inquiry is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims. *Id.* (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In deciding a 12(b)(6) motion, courts must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683). Nevertheless, courts are not required to credit bald assertions or legal conclusions alleged in the complaint. *Id.* (citing *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1429 (3d Cir.1997)). Similarly, legal conclusions draped in the guise of factual allegations do not benefit from the presumption of truthfulness. *Id.* (citing *In re: Nice Systems, Ltd. Securities Litig.,* 135 F.Supp.2d 551, 565 (D.N.J.2001)).

As a general matter, courts ruling on a motion to dismiss may not consider matters extraneous to the complaint. *Burlington Coat Factory,* 114 F.3d at 1426. However, an exception to the general rule is that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." *Id.* (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996) and citing *Trump Casino,* 7 F.3d at 368 n. 9 ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.")). The rationale underlying this exception is that the primary problem raised by considering documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice and has

relied upon the documents in framing the complaint. *Id.* (quotations and citations omitted). For the same reason, courts may consider matters of public record that are relied upon or cited in the complaint. *In re: Cybershop.com Securities Litig.,* 189 F.Supp.2d 214, 223–24 (D.N.J.2002).

## B. Section 10(b) of the Exchange Act and Rule 10b–5

Section 10(b) of the Exchange Act and Rule 10b–5 create liability for securities fraud, *i.e.* for false or misleading statements or omissions of material fact, *Burlington Coat Factory,* 114 F.3d at 1417, or for deceptive or manipulative acts, *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 207 (3d Cir.2001), that affect the trading of securities on the secondary market. Section 10(b) provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility or national securities exchange—
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). To implement this section, the SEC enacted Rule 10b–5, violation of which gives rise to a private cause of action. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Rule 10b–5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

There are two types of claims available under Section 10(b) and Rule 10b–5: misrepresentation or omission of material facts, *Burlington Coat Factory,* 114 F.3d at 1417, and market manipulation, *Colkitt,* 272 F.3d at 207. Plaintiffs in this case allege both.

### 1. Misrepresentation or Omission of Material Facts

To state a securities fraud claim for misrepresentation or omission of material facts, a plaintiff must plead:

(1) that defendant made a misstatement or an omission of a material fact,

(2) in connection with the purchase or sale of a security,

(3) upon which plaintiff reasonably relied;

(4) that plaintiff's reliance was the proximate cause of the injury suffered; and

(5) that defendant acted with scienter.

*See Semerenko v. Cendant Corp.,* 223 F.3d 165, 174 (3d Cir.2000). A defendant cannot be held liable for failure to disclose unless plaintiff first establishes a duty to disclose, since "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Except for specific periodic reporting requirements, primarily the quarterly and annual reports, there is no gen-

eral duty on the part of a company to provide the public with all material information. *Burlington Coat Factory,* 114 F.3d at 1432 (citing *In re: Time Warner, Inc. Securities Litig.,* 9 F.3d 259, 267 (2d Cir.1993) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.")). Nonetheless, a duty to disclose may arise where there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure. *Oran v. Stafford,* 226 F.3d 275, 285–86 (3d Cir.2000) (citations omitted). In the latter connection, a company may be subject to a duty to correct or update a prior disclosure. *Id.* at 286. The duty to correct arises "when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *Id.* (quoting *Burlington Coat Factory,* 114 F.3d at 1431). The duty to update "concerns statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *Id.*

A fact is material if there is a substantial likelihood that a reasonable investor would have viewed it as having significantly altered the total mix of information available to the public. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 280 n. 11 (3d Cir.1992) (quotations omitted). "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). However, the Third Circuit has fashioned a special rule for deciding materiality as a matter of law in the context of an efficient securities market. *Oran,* 226 F.3d at 282 (3d Cir.2000) (citing *Burlington Coat Fac-*

*tory,* 114 F.3d at 1425). The rule is based on the fundamental economic insight that in an open and developed market, the price of a company's stock is determined by all available material information regarding the company and its business. *Id.* In an efficient market, "information important to reasonable investors . . . is immediately incorporated into the stock price." *Id.* As a result, when a stock is traded in such a market, the materiality of disclosed information may be measured by looking to the movement of the stock's price in the period immediately following disclosure. *Id.* If a company's disclosure has no effect on the stock price, "it follows that the information disclosed . . . was immaterial as a matter of law." *Id.*

### 2. Market Manipulation

Third Circuit case law on market manipulation is sparse. In 2001, the Third Circuit noted that "we .seem not to have addressed squarely what elements are required to establish a claim of market manipulation." *Colkitt,* 272 F.3d at 203. Section 10(b) provides in relevant part that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" promulgated by the SEC. *Id.* The SEC's Rule 10b–5 states in pertinent part that "[i]t shall be unlawful for any person . . . [t]o employ any device, scheme, or artifice to defraud." *Id.*

*Colkitt,* read in conjunction with the well-established law on pleading a Section 10(b)/Rule 10b–5 claim, instructs that in order to state a claim of market manipulation, a plaintiff must plead that:

(1) in connection with the purchase or sale of securities,

(2) defendant engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security,

(3) for the purpose of artificially depressing or inflating the price of the security;

(4) that plaintiff reasonably relied on the artificial stock price;

(5) that plaintiff's reliance proximately caused plaintiff's damages; and

(6) that defendant acted with scienter.

See *Colkitt,* 272 F.3d at 206 n. 6; *see also Semerenko,* 223 F.3d at 174.

The issue of market manipulation in *Colkitt* arose in the context of an affirmative defense under Section 29(b) of the Exchange Act. Section 29(b) provides that a contract made or performed in violation of any other section of the Exchange Act or in violation of any rule or regulation promulgated thereunder is void. *Colkitt,* 272 F.3d at 199. As an affirmative defense to a breach of contract claim, Colkitt argued that because plaintiff had violated Section 10(b) and Rule 10b–5 by engaging in market manipulation, the contract at issue was void pursuant to Section 29(b). *Id.* The Third Circuit held that in order for an affirmative defense of market manipulation to survive summary judgment, a party must prove steps (1) through (3), noted above. *Id.* at 207. The court also noted that in order to maintain any private cause of action under Section 10(b), a plaintiff must also prove reliance and damages. *Id.* at 206 n. 6 (clarifying that "Section 29(b) only requires a violation of Section 10(b), not the maintenance of a private suit under Section 10(b)," which "requires a plaintiff to prove reliance and damages."). Though procedurally *Colkitt* involved summary judgment, the Third Circuit has made clear on other occasions that in order for a Section 10(b)/Rule 10b–5

claim to survive a motion to dismiss, a plaintiff must plead reliance, causation of damages, and also scienter (*i.e.* steps (4) through (6), noted above). *E.g., Semerenko,* 223 F.3d at 174.

## C. Federal Rule of Civil Procedure 9(b)

Since claims brought under Section 10(b) and Rule 10b–5 are fraud claims, plaintiffs must comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Rockefeller,* 311 F.3d at 216. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Id.* This requirement has been rigorously applied in securities fraud cases. *Id.* (citing *Burlington Coat Factory,* 114 F.3d at 1417). Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the necessary factual background that would accompany "the first paragraph of any newspaper story," that is, the "who, what, when, where and how" of the relevant events. *Id.* at 217 (citing *Burlington Coat Factory,* 114 F.3d at 1422). Rule 9(b)'s heightened pleading standard serves important objectives: it "gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *Id.* at 216 (quoting *Burlington Coat Factory,* 114 F.3d at 1418).

Nevertheless, the Third Circuit has also warned that courts should be "sensitive" to situations in which "sophisticated defrauders" may "successfully conceal the details of their fraud." *Id.* If plaintiffs can show that the requisite factual information is "peculiarly within the defendant's knowledge or control," the strict requirements of Rule 9(b) may be relaxed. *Id.* In order to

get the benefit of this relaxed standard, "at the very least plaintiffs must allege that the necessary information lies within defendants' control." *Shapiro*, 964 F.2d at 285. A boilerplate allegation that the information "lies within defendants' exclusive control" will not suffice—plaintiffs must accompany such an allegation with a statement of facts upon which the assertion is based. *Id.* "To avoid dismissal in these circumstances, a complaint must delineate at least the nature and scope of plaintiffs' efforts to obtain, before filing the complaint, the information needed to plead with particularity." *Id.; see also Rockefeller*, 311 F.3d at 216.

Citing case law from the Southern District of New York, plaintiffs argue that market manipulation claims are entitled to the benefit of a less exacting pleading standard. Pl. Br. at 19. In that district, plaintiffs bringing a market manipulation claim are entitled to a somewhat relaxed pleading standard [8] because "the facts relating to a manipulation scheme are often known only by the defendants." *Internet Law Library*, 223 F.Supp.2d at 486; *In re Blech Securities Litig.*, 928 F.Supp. 1279, 1290–91 (S.D.N.Y.1996). As noted above, the Third Circuit also allows a relaxed pleading standard in certain securities fraud cases because the pertinent information may be in the exclusive control of defendants. *Shapiro*, 964 F.2d at 285. However, in order to obtain the benefit of this relaxed standard in the Third Circuit, plaintiffs must plead that the information missing from their complaint is in the exclusive control of defendants, and must also plead the extent of their efforts to obtain the information prior to filing their complaint. *Id.* Plaintiffs in this case have

made no such allegations in their Second Amended Complaint. Accordingly, their claims are not entitled to a relaxed pleading standard.

## D. The Private Securities Litigation Reform Act

In addition to Rule 9(b), plaintiffs alleging securities fraud must also comply with the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u–4(b)(1), (b)(2); *Rockefeller*, 311 F.3d at 217. The PSLRA was designed to establish a "uniform and stringent pleading" standard and to provide companies added protection against what Congress perceived as a growing number of frivolous "strike suits" aimed at achieving quick settlements. *Nappier v. Pricewaterhouse Coopers LLP*, 227 F.Supp.2d 263, 273 (D.N.J.2002) (citing *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 531 (3d Cir.1999)). Section 78u–4(b)(1) requires specificity in pleading a claim of misrepresentation or omission of material fact. It provides:

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation re-

8. Even under the relaxed standard in the Southern District of New York, plaintiffs must specify, at a minimum: "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Internet Law Library, Inc. v. Southridge Capital Management, LLC*, 223 F.Supp.2d 474, 486 (S.D.N.Y.2002) (quotations omitted).

garding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. *Advanta*, 180 F.3d at 530. Section 78u–4(b)(2) requires a showing of scienter, or knowledge, in any securities fraud claim:

"[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Advanta*, 180 F.3d at 530–31. Failure to meet the pleading requirements of the PSLRA results in mandatory dismissal of the complaint. *See* 15 U.S.C. § 78u–4(b)(3)(A); *see also Nappier*, 227 F.Supp.2d at 274.

Scienter is adequately plead by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior" or by alleging facts "establishing a motive and an opportunity to commit fraud." *Advanta*, 180 F.3d at 534–35 (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n. 8 (3d Cir.1997)). Pursuant to the PSLRA, allegations of scienter must be supported by facts stated "with particularity" and must give rise to a "strong inference" of scienter. *Id.* at 535. This requirement of scienter supercedes Rule 9(b) to the extent that the Rule would otherwise allow state of mind to be averred generally. *Id.* at 531 n. 5. A reckless act is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quotations omitted). "The definition of 'reckless behavior' should not be a liberal one lest any discernable distinction between 'scienter' and 'negligence' be obliterated." *In re: Digital Island Securities Litig.*, 223 F.Supp.2d 546, 555 (D.De.2002) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)). Conscious wrongdoing can be shown through specific allegations of such acts as "intentional fraud or other deliberate illegal behavior." *Advanta*, 180 F.3d at 535.

Since passage of the PSLRA in 1995, "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *Id.* Courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Burlington Coat Factory*, 114 F.3d at 1424 (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994) (noting in a similar context that if "incentive compensation" could be the basis for an allegation of fraud, "the executives of virtually every corporation in the United States would be subject to fraud allegations.")). "Instead, plaintiffs must allege that [a defendant's stock] trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *Id.*

## IV. PLAINTIFFS' CLAIMS

Each of plaintiffs' three claims is premised on alleged violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. One claim is for misrepresentation and non-disclosure of material facts, specifically: the misleading comparison of current revenues to prior sales contained in IDN's Third Quarter 2001 10–QSB; fail-

ure to disclose the existence of VeriFone as a key competitor; and inadequate disclosure of the details of the Messina lawsuit. *See* Second Amended Complaint at ¶¶ 79–89. A second claim is for market manipulation; this claim includes all of the improprieties alleged in the Second Amended Complaint, specifically: the blocked sales of Messina's stock; the rights offering; interference with Borislow's trading activity; and the three allegations comprising the misrepresentation/non-disclosure claim. *See* Pl. Br. at 18, 20; *see also* Second Amended Complaint at ¶¶ 71–78. The third claim is directed at the individual defendants, pursuant to Section 20(a) of the Exchange Act, which provides a cause of action against certain individuals responsible for violations of Section 10(b) and Rule 10b–5. Second Amended Complaint at ¶¶ 90–95.

I will analyze each of the allegations that comprise these claims individually. Plaintiffs argue that I should instead read the complaint as a whole. Pl. Br. at 20. Under plaintiffs' theory, if I find that one of the fraud allegations lacks merit, I should nonetheless allow it to remain in the complaint because it is "part of a larger scheme" of market manipulation. *Id.* However, the Third Circuit rejected a similar argument in the securities fraud context:

> Plaintiffs argue that the district court, by "compartmentalizing the evidence and wiping the slate clean after considering each component," failed to give weight to the "totality of the pleadings". . . . We have instructed that the district courts should engage in precisely the sort of analysis undertaken by the district court in this case, [citations omitted], and we therefore find no merit in this argument.

*In re: Westinghouse Securities Litig.*, 90 F.3d 696, 712 (3d Cir.1996). Thus, I will "compartmentalize" plaintiffs' various allegations and analyze whether each has merit standing on its own.

As an additional preliminary note, the full caption of the market manipulation claim is "For violations of Section 10(b) and Rule 10b–5 thereunder against defendants based upon deceptive and manipulative practices *in connection with the IPO*" (caption preceding ¶ 71 of the Second Amended Complaint) (emphasis added). However, plaintiffs have not alleged any type of deceptive or manipulative practices by defendants whatsoever in connection with the IPO. The IPO was completed in November of 1999, *id.* at ¶ 11, though plaintiffs do not allege any impropriety on the part of defendants until May 9, 2001, when defendants issued a press release announcing the allegedly misleading comparison of current revenues with prior sales, *id.* at ¶ 33. While plaintiffs allege that the May 9 press release "continued to mislead the market place," *id.*, the press release is indeed plaintiffs' earliest plead example of anything that can possibly be construed as misleading. Even IDN's announcement of its new revenue recognition policy, which is not alleged to have contained any misleading information, was not publicized until the filing of its Year 2000 10–KSB, on March 29, 2001, almost a year and a half after the IPO. *See id.* at ¶¶ 28–30. Plaintiffs' brief is devoid of any reference to the IPO, and of any allegation of impropriety even remotely concerning the IPO. To the extent plaintiffs claim any type of securities fraud "in connection with the IPO," such claim is dismissed.

Before examining plaintiffs' six allegations of impropriety [9] that form the basis of their claims, I will first discuss the

---

9. Described above in sections I.B.1 through I.B.6.

issues of reliance and causation, elements necessary for the survival of each allegation.

### A. Reliance

■ To state a claim for securities fraud under Section 10(b) and Rule 10b–5 thereunder, a complaint must show that plaintiffs reasonably relied on defendants' allegedly fraudulent misrepresentations, omissions, or conduct. *Zlotnick v. TIE Communications*, 836 F.2d 818, 821 (3d Cir.1988). In *Zlotnick*, plaintiff believed Technicom's stock was overvalued because his analysis of the company's earnings and prospectus suggested to him that the company was not earning nearly enough to justify its stock price, and because he expected Technicom to face future competition that would diminish its profits and decrease further earnings. *Id.* at 819. He therefore sold short 1,000 shares of its stock on January 6, 1983, and another 1,000 shares five days later. *Id.* At the time of his short sales he was unaware of any wrongdoing or misrepresentations by defendants; he did not base his decision to sell short on a belief that the company was deceiving investors. *Id.* In early 1983, subsequent to plaintiff's short sales and unbeknownst to him, defendants—TIE, the parent company of Technicom, and Kifer, Technicom's Chairman and CEO— allegedly took action to artificially inflate the price of Technicom's stock. *Id.* Specifically, they caused the company to issue several press releases which misrepresented the company's sales agreements and earnings prospects, and caused the company to engage in illusory sales to TIE. *Id.* These actions had the desired effect of falsely inflating Technicom's stock price. *Id.* On March 14, 1983, plaintiff, unaware

of these deceptive practices, decided to cut his losses by making the purchases necessary to cover his short positions, for a loss of approximately $35,000. *Id.* After Technicom issued more realistic statements, its stock price dropped sharply. *Id.* By the summer of 1983, its stock price was significantly lower than it had been the previous January when plaintiff acquired his short positions. *Id.*

The sole issue before the Third Circuit was whether plaintiff adequately plead reliance. *Id.* at 821.[10] Plaintiff argued that he should be entitled to the presumptions afforded parties under the "fraud on the market theory." *Id.* That theory creates a three-fold rebuttable presumption of reliance: first, the court presumes that the misrepresentation or fraudulent act affected the market price; second, it presumes that plaintiff did in fact rely on the price of the stock as indicative of its value at the time plaintiff purchased the stock; third, it presumes the reasonableness of that reliance. *See id.* at 822. The court found that a short seller, because of his belief that the market price is not a dependable indicator of the stock's value at the time of the initial short sale, is not entitled to the *presumptions* of the fraud on the market theory. *Id.* at 822–23. A short seller may, however, use that same theory to prove his reliance; he is merely not accorded the theory's presumptions, which are granted to other investors. *Id.* at 822, 824. Thus, a short seller may prove reliance by showing that: 1) the misrepresentation or fraudulent act raised the stock's price; 2) when making the covering purchase, he relied on the integrity of the market price of the stock; that is, he believed that the stock's price, at the time

---

**10.** Since plaintiff did not allege any wrongdoing on the part of defendants prior to his initial decision to sell short, the inquiry was focused on whether plaintiff could have reasonably relied on defendants' fraudulent conduct at the time he made his covering purchases. *See id.* at 824 n. 9.

he covered, accurately reflected the stock's true value because he was ignorant of any fraud; and 3) his reliance on the stock's price at the time of cover was reasonable. *Id.* at 821–22.

*Zlotnick* classified reliance on the market price of a stock as indirect reliance. *Id.* at 822, 823–24. It is so called because the misrepresentation or fraudulent act is not perpetrated directly on plaintiff. *Id.* Rather, the fraud is incorporated into the stock's price. *Id.* at 822. Thus, when plaintiff relies on the stock's price in making a purchase, he indirectly relies on defendants' fraud. *Id.* The court stressed that plaintiff's reliance must be actual; that is, plaintiff must be the one who actually relies on the stock's price. *Id.* at 823–24. The court squarely rejected an alternative theory of reliance whereby a short seller who is aware of defendants' fraud at the time he covers may nonetheless state a claim by arguing that the market was unaware of the fraud, and thus the stock's price remained artificially high despite his knowledge of the fraud. *Id.* The court reasoned that a plaintiff cannot recover for the reliance of other investors: "to the extent Zlotnick argues he is entitled to recover for the reliance of third parties, we reject his claim." *Id.* at 824.

For purposes of this case, the important lesson from *Zlotnick* is that if plaintiffs' complaint shows that at the time they covered, they were unaware of any fraudulent activity by defendants, they have adequately plead reliance. *Id.* at 822, 824. However, if plaintiffs were aware of defendants' fraud when they covered, then as a matter of law they are unable to show reasonable reliance, and their claims necessarily fail. *See id.* at 822 n. 6 ("if Zlotnick had known of the misrepresentation [when he covered], it would not have been reasonable for him to rely on the price of

the stock as an accurate indication of the stock's value when he made his [covering] purchase.")

### 1. Plaintiffs Cannot Show Reasonable Reliance on IDN's Allegedly Misleading Accounting.

■ The rule announced in *Zlotnick* requires dismissal of many portions of plaintiffs' Second Amended Complaint. Most glaring is plaintiffs' attempt to recover for IDN's allegedly misleading comparison of current revenues to prior sales in its Third Quarter 2001 10–QSB.[11] Plaintiffs were certainly not fooled by this tactic, for they themselves explain that they perceived it as misleading when they noticed it in IDN's previous filings and press releases—indeed, that is precisely why plaintiffs allege they began to short sell IDN's stock in the first place. *See, e.g.,* Second Amended Complaint at ¶ 25.

Plaintiffs try to dodge this obvious defect in their pleading by alleging that when they were "forced to cover," they "relied on the integrity of the market for IDN stock in light of IDN's steadfast position that its accounting was proper," *id.* at ¶ 66, in an apparent attempt to parrot the legal standard of *Zlotnick.* Their assertion, however, runs afoul of *Zlotnick* in three respects. Firstly, as *Zlotnick* notes, there is no time limit on when a short seller may choose to cover. 836 F.2d at 820. Thus, it is disingenuous for plaintiffs to claim—as they do throughout the Second Amended Complaint and their brief—that they were "forced" to cover. *See id.* at 824 n. 8. Secondly, plaintiffs' assertion that they "relied on the integrity of the *market*" is also misplaced. *Zlotnick* carefully explained the difference between reliance on the integrity of the market and reliance on the integrity of the market price of a

---

11. Described above in section I.B.1.

stock. *Id.* at 823. The court reasoned that a short seller can show reliance on the latter, not the former.[12] *Id.* Notwithstanding that defect, the third and most substantial problem with plaintiffs' allegation is the one discussed above: it is inconsistent with other allegations of their Second Amended Complaint. Plaintiffs were well aware of IDN's accounting methods, however misleading they may have been. They are therefore unable to show reasonable reliance on IDN's "steadfast position that its accounting was proper." *See id.* at 822 n. 6.

Further support for dismissal of plaintiffs' allegations of accounting impropriety is found in *Moelis v. ICH Corp.,* 1987 WL 9709, * 4 (S.D.N.Y.1987).[13] In *Moelis,* plaintiff decided to short sell after reading an article in Barron's which concluded that defendant ICH's accounting techniques misleadingly inflated its assets and income. *Id.* at *3. After plaintiff suffered losses on his covering purchases, he brought suit against ICH, basing one of his securities fraud claims on the very same accounting techniques that prompted him to enter into the short sale in the first place. The court noted that "[b]y his own admission, Moelis was aware of the alleged fraud and did not rely on the inflated financial statement." *Id.* Holding that plaintiff could therefore not recover for that alleged fraud, the court reasoned that:

> [p]laintiff does not contend that he was in any sense deceived by the inflated financial statements when he made his

... short sale. To the contrary, his short sale was motivated by his perception of the fraud: he went short because the Barron's article had made him aware of the overstatements. It was his hope that when others acquired the same awareness of ICH's past misstatements, there would be heavy selling resulting in a drop in the market and profit on his short position.

*Id.* at *4. The exact situation is presented in this case. Believing IDN's accounting was misleading, plaintiffs sold short, hoping that other investors would catch on and the stock price would fall. Second Amended Complaint at ¶41. Now that the stock price has not fallen, plaintiffs have brought a fraud claim against IDN for those same allegedly misleading accounting methods of which they were plainly aware at all relevant times. Such a claim clearly fails.

Accordingly, to the extent plaintiffs' claims seek recovery for IDN's allegedly misleading accounting methods, the claims are dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

### 2. Plaintiffs' Limited Ability to Show Reasonable Reliance on Their Remaining Allegations of Fraud

 The first complaint in this case was filed with only Jones as a named plaintiff, on October 18, 2001—*before* Jones made any covering purchases. Class Action Complaint at ¶10 ("Plaintiff has not, to

---

12. This is because a typical investor relying on the integrity of the market when purchasing a stock is relying on the market's *future* ability to take into account factors that will hopefully raise the stock price, thus giving the investor a return; whereas a short seller making a covering purchase is relying on the integrity of the market price in a stock because of the belief that *at the time of the covering purchase,* the price reflects the true worth of the company. *Id.* at 823. The plain-

tiff in *Zlotnick* also plead the wrong sort of reliance (*i.e.* reliance on the integrity of the market as opposed to reliance on the integrity of a stock's market price), but the court did not consider the defect fatal to his claim. *See id.* at 824.

13. Cited by defendants for two different propositions. Def. Br. at 17, 18.

date, purchased the securities of [IDN] to cover" the short sales.).[14] In the Class Action Complaint, in addition to the claim of improper accounting for which he may not recover, Jones alleged failure to disclose the existence of VeriFone, and manipulation of the supply of shares through the rights offering. Thus, before Jones made a single covering purchase, he was aware of these allegedly fraudulent acts or omissions on the part of defendants. Therefore, even assuming *arguendo* that the failure to disclose VeriFone and the rights offering constituted fraud, they cannot form the basis of a valid claim for Jones because at the time he covered he knew that the market price was affected by that fraud. *See Zlotnick*, 836 F.2d at 822 n. 6. He is therefore unable to show reasonable reliance with respect to the failure to disclose VeriFone and the rights offering. *See id.* To the extent Jones' claims in the Second Amended Complaint seek redress on those bases, his claims are dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

On November 30, 2001, Borislow joined Jones in filing the First Amended Complaint. This complaint contained the same six allegations[15] as the Second Amended Complaint now before the Court. Thus, it is clear from the record that by November 30, 2001, at the very latest, both plaintiffs had knowledge of every alleged fraudulent act or omission. What is not clear is precisely when each plaintiff first learned of the alleged fraud. This information is crucial because, according to *Zlotnick*,

plaintiffs are unable to show reasonable reliance with respect to any alleged impropriety that they knew about when they made their covering purchases. *See id.*

The Second Amended Complaint therefore lacks critical particulars. This inadequacy is discussed more fully in the succeeding section regarding the specificity of losses plead. At this juncture it is enough to say that, as a matter of law, plaintiffs cannot base their claims on any alleged fraud known to them when they covered. To the extent plaintiffs seek to do so, their claims are dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

## B. Causation/Specificity of Losses Plead

■ Plaintiffs in a securities fraud case must show that their reliance on the fraud proximately caused their losses. *Semerenko*, 223 F.3d at 174. To survive a motion to dismiss, plaintiffs must allege facts sufficient to show that they suffered a monetary loss by purchasing shares whose prices were artificially inflated by defendants' fraudulent actions, misrepresentations or omissions. *See id.* at 185–86. Plaintiffs in this case have alleged:

78. As a result of the manipulative conduct set forth herein, Plaintiffs purchased or otherwise acquired IDN's stock during the Bubble Period at artificially inflated prices to cover their short sales and were damaged thereby.

89. As a result of the dissemination of materially false and misleading in-

---

14. As defendants point out, a short seller cannot recover for any claim of securities fraud before the covering purchases are made. *Moelis*, 1987 WL 9709, at * 2 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539). In light of that, it is worth mentioning defendants' speculation that Jones' motivation for filing the complaint at such an early date, as well as

for issuing two public notices of the action within a week of filing the complaint, was the hope that IDN's stock price would drop as the market reacted to the suit, so that his covering purchases would not be as costly. *See* Def. Br. at 2.

15. Described above in sections I.B.1 through I.B.6.

formation described above, Plaintiffs purchased or otherwise acquired IDN's stock during the Bubble Period without knowledge of the fraud alleged herein at artificially inflated prices and were damaged thereby.

Second Amended Complaint at ¶¶ 78, 89. Assuming the truth of those allegations, and taking all reasonable inferences in the light most favorable to plaintiffs, they have adequately plead causation. *See Semerenko*, 223 F.3d at 186.

Defendants insist that the aftermath of September 11, 2001, specifically the market's newfound interest in security-related products such as IDN's identification verification system, was the true cause of the spike in IDN's stock price and plaintiffs' resultant losses. Def. Br. at 1. While a factfinder may very well agree with defendants, their argument is irrelevant to this motion to dismiss. *Semerenko*, 223 F.3d at 186–87.

In a related issue, defendants contend that plaintiffs have not plead their losses with sufficient particularity, pursuant to Fed.R.Civ.P. 9(b). Def. Br. at 15–17. According to the Second Amended Complaint:

> Between February 23, 2001 and September 20, 2001, plaintiffs short-sold 215,300 shares of IDN's common stock. Plaintiffs were forced to purchase IDN shares at inflated prices to cover these short positions beginning in October 18, 2001 through January 3, 2002, and have incurred over $2,000,000 in losses as a result.

Second Amended Complaint at ¶ 8. Defendants argue, *inter alia*, that Rule 9(b) requires plaintiffs to plead the specific details of their transactions and resultant losses.

In *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1059–60 (S.D.N.Y.1989), plaintiffs claimed, in part, that a company's fraudulent misrepresentations caused harm to a class of investors who purchased the company's stocks. *Id.* at 1058. The court made clear that in order to recover, plaintiffs had to show that they relied on those misrepresentations. *Id.* at 1060. In this connection, the only relevant stock purchases were those that took place after the alleged misrepresentations. *Id.* Thus, plaintiffs were required to plead the dates of their purchases made after the alleged fraud. *Id.* at 1060–61.

Similarly, in this case, the dates of plaintiffs' transactions are relevant to the issue of reliance. Specifically, as discussed in the preceding section, plaintiffs cannot base their claims on any alleged fraud known to them when they covered. Thus, in addition to the dates Jones and Borislow first became aware of each allegation of fraud, it is necessary to know, for each individual plaintiff, including D & K Charitable Foundation, and for each short sale: the date the short position was acquired, the number of shares acquired, the sale price of those shares, the date the covering purchase was made, and the price of the covering purchase. That information is crucial to an understanding of which plaintiff may be entitled to recover for losses on which covering transaction, and in what amount. Plaintiffs' failure to plead these particulars is a basis for dismissing the Second Amended Complaint in its entirety, pursuant to Fed.R.Civ.P. 9(b).

## C. Failure to Disclose the Existence of VeriFone

Plaintiffs allege that IDN failed to inform the market of the existence of a major new competitor in its field, VeriFone.[16] VeriFone announced its arrival on

16. This allegation is described more fully in section I.B.2 above.

the market by way of a press release on June 20, 2001. Second Amended Complaint at ¶ 44. After that date, IDN made several filings with the SEC, none of which discussed VeriFone in any way. *Id.* at ¶ 46. One of those filings, an amendment to its Year 2000 10–KSB, was made on October 9, 2001. *Id.* at ¶ 47. Pursuant to SEC regulations, there is a duty to disclose competition in annual reports. As a "small business issuer," [17] IDN's disclosure requirements under the Exchange Act are governed by Regulation S–B. 17 C.F.R. § 228.10(a). Regulation S–B provides that, when filing an annual report, a company must describe "to the extent material to an understanding of the issuer: ... [c]ompetitive business conditions and the small business issuer's competitive position in the industry and methods of competition." *Id.* at § 228.101(b)(4); *see also* Form 10–KSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,133 (Item 1) at 22,094 (Oct. 9, 2002) (referring the small business issuer to 17 C.F.R. § 228.101).

Defendants' amended Year 2000 10–KSB reported in the "Competition" section:

Unless a device can read, decode and analyze all of the information legally permitted to be analyzed which is electronically stored on a driver license, the user may not obtain accurate and reliable confirmation that a driver license is valid and has not been altered or tampered with. We are aware of several companies, including Legal Age and The IndentiScan Company, LLC, that are currently offering products that electronically read and calculate age from a driver license. We have tested and compared some of these products to ID–Check and believe that our product is superior in quality and functionality. These other products are based on types of equipment which have limited functionality. Those units that cannot read barcodes are at a significant disadvantage because nearly 31% of the currently issued driver licenses as well as all encoded U.S. military ID's and uniformed services cards contain barcodes. This percentage is expected to continue to increase within the next year based upon current available information. In addition, some of these other products cannot connect to a PC or use a printer. We also believe that some of these products may infringe on our patent.

There are also products being marketed which are essentially electronic calendars designed to assist the retailer in calculating the age of the person presenting a driver license. These devices, however, cannot determine whether a driver license is valid or has been altered.

A very small number of laminate verifiers are currently used to determine the validity of the laminate on a driver license. However, laminate verifiers are fragile, not reliable and we believe can only be used in New York State.

IDN's Form 10–KSB/A, p. 7.[18]

Plaintiffs allege that VeriFone markets the same type of product as IDN, and

---

17. That IDN is a small business issuer is evidenced by the fact that it uses Forms 10–KSB and 10–QSB for its annual and quarterly filings, respectively. The "SB" stands for "small business." *See* Form 10–KSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,-132(A) at 22,091–3 (Jan. 15, 2003); Form 10–QSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,041(A) at 22,032 (Jan. 15, 2003).

18. This is the same language as is in IDN's original Year 2000 10–KSB, filed March 29, 2001. *See* Karam Dec. at Ex. C, p. 7.

Though neither party submitted IDN's amended Year 2000 annual report to the Court, I will consider it for purposes of this motion to dismiss because plaintiffs' claims are in part based upon it. *Trump Casino,* 7 F.3d at 368 n. 9.

enjoys a unique advantage in the identification verification market because its technology can coexist on terminals that it has already provided to the global market. *See* Second Amended Complaint at ¶ 45. IDN's amended Year 2000 annual report, however, describes only competitors whose products have "limited functionality," some of which "cannot connect to a PC or use a printer," or are incompatible because they are unable to electronically verify the accuracy of an identification card as can IDN's ID–Check. IDN's Form 10–KSB/A, p. 7. Thus, I find that a question of fact exists as to whether IDN fulfilled its duty of disclosing "competitive business conditions" in its amended Year 2000 annual report. *See* 17 C.F.R. § 228.101(b)(4).

An equally viable theory of recovery for IDN's failure to disclose the existence of VeriFone is that IDN was subject to a duty to update the description of its competition in its SEC filings once IDN learned of the emergence of VeriFone. A company is under a duty to update a prior disclosure if it "[b]ecomes misleading when viewed in the context of subsequent events." *Oran*, 226 F.3d at 286 (quoting *Burlington Coat Factory*, 114 F.3d at 1431). As noted above, in IDN's Year 2000 10–KSB, filed March 29, 2001 and amended October 9, 2001, IDN disclosed the existence of various competitors whose products are portrayed as substandard to IDN's. In contrast, plaintiffs suggest that VeriFone's product is superior to IDN's. *See* Second Amended Complaint at ¶ 45. Hence, I find that a question of fact exists as to whether the arrival of VeriFone rendered IDN's previous disclosures of its competitors misleading, and thus whether IDN was under a duty to update its Year

2000 10–KSB, both as originally filed and as amended, to reflect the existence of VeriFone.[19]

Defendants argue that they had no such duty because the market was already aware of VeriFone. Def. Br. at 20. As stated in the Second Amended Complaint ¶¶ 44–45, VeriFone announced its product through a press release on June 20, 2001, and its website contained a detailed description of its product. *Id.* Defendants also contend that plaintiffs themselves informed the market of VeriFone when they issued two press releases, on October 18 and October 25, 2001, announcing the basis of the class action suit to potential class members. *Id.* at 2, 20.[20]

Defendants' arguments are unavailing. *In re Campbell Soup Company Securities Litig.*, 145 F.Supp.2d 574 (D.N.J.2001), dealt with a similar issue. In that case, plaintiffs alleged that Campbell was aggressively supplying its customers with far more cans of its soup than they required, without informing the market, and all the while reporting in SEC filings that its sales and earnings were steadily increasing. *Id.* at 580–82. When Campbell finally revealed the extent of its sales tactics, its stock price fell significantly, to the detriment of the class of investors. *Id.* at 582. Plaintiffs contended that Campbell's earlier failure to disclose its sales practices rendered their reported earnings misleading and artificially inflated its stock price. *See id.* at 585. Campbell responded that the market knew of its sales tactics by way of various analyst reports which defendants included in their filings. *Id.* at 588 n. 1. The court found that it could not consider the reports for the pending motion to dismiss because plaintiffs did not

19. Thus, plaintiffs' concession that "[p]erhaps" no cause of action exists for failure to disclose competition, is unwarranted. Pl. Br. at 20.

20. While defendants contend that "plaintiffs" issued the press releases announcing "their" claims of fraud, only Jones was a named plaintiff in the class action suit.

rely on those reports in their complaint. *Id.* The reasoning in *Campbell* is equally applicable here: this Court cannot consider the press releases that plaintiffs allegedly issued announcing the class action complaint because plaintiffs did not rely on those releases in pleading their Second Amended Complaint. In any event, defendants have not submitted copies of the releases, so the Court does not know if any mention was actually made of VeriFone.

Defendants further argue that any failure to disclose the existence of VeriFone is immaterial as a matter of law because when plaintiffs issued the press releases announcing VeriFone's existence as a previously undisclosed competitor, IDN's stock prices rose instead of fell. Def. Br. at 20. This method of determining materiality is valid in the Third Circuit in the context of an efficient market, *see Oran*, 226 F.3d at 282 (discussed above in section III.B.1). IDN's stock is traded on the American Stock Exchange, "a market which has always been found efficient." *RMED International, Inc. v. Sloan's Supermarkets, Inc.*, 185 F.Supp.2d 389, 405 (S.D.N.Y.2002); Second Amended Complaint at ¶ 11. However, for the reasons explained above, this Court cannot consider plaintiffs' press releases and therefore cannot consider their effect on the stock price. *See Campbell*, 145 F.Supp.2d at 588 n. 1; *see also Burlington Coat Factory*, 114 F.3d at 1424–25 (district court's reliance on information based solely on an affidavit attached to defendant's motion to dismiss was improper). Hence, I find that the question of the materiality of IDN's failure to disclose the existence of VeriFone cannot be decided on this motion to dismiss. *Shapiro*, 964 F.2d at 280 n. 11.

Thus, this claim will not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). However, to survive a motion to dismiss, plaintiffs must also comply with the PSLRA's requirement of raising a strong inference of scienter by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." [21] *Advanta*, 180 F.3d at 534–35. A reckless act is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 535 (quotations omitted). "The definition of 'reckless behavior' should not be a liberal one lest any discernable distinction between 'scienter' and 'negligence' be obliterated." *Digital Island*, 223 F.Supp.2d at 555. Conscious wrongdoing can be shown through specific allegations of such acts as "intentional fraud or other deliberate illegal behavior." *Advanta*, 180 F.3d at 535.

The Second Amended Complaint contains no allegations that would support any inference, much less a strong inference, that IDN intended to commit fraud by failing to disclose the existence of VeriFone in its amended Year 2000 10–KSB. Nor have plaintiffs alleged any support for the inference that IDN's failure to disclose VeriFone was "an extreme departure from the standards of ordinary care." At best, plaintiffs have alleged that IDN was negligent in submitting an incomplete or misleading filing with the SEC. This is not scienter. Thus, plaintiffs' claim of failure to disclose competition is dismissed for failure to comply with the PSLRA.

---

**21.** Scienter can also be shown by alleging facts "establishing a motive and an opportunity to commit fraud." *Advanta*, 180 F.3d at 534–35. Plaintiffs do not attempt to show IDN's scienter by alleging that the Company had a motive and opportunity to commit fraud. Plaintiffs attempt this method of pleading scienter with respect to the individual defendants, as discussed below in section IV.H.2.

## D. Failure to Timely and Adequately Disclose Details of the Messina Lawsuit

█ Kevin Messina, a former officer and director of IDN, filed a lawsuit on October 19, 2001, against the Company seeking a preliminary injunction enjoining it from restricting sales of his shares of company stock. Regulation S–B governs the requirements for a small business issuer's disclosure of legal proceedings. In the Company's annual and quarterly reports, it must do the following:

(a) If a small business issuer is a party to any pending legal proceeding (or its property is the subject of a pending legal proceeding), give the following information (no information is necessary as to routine litigation that is incidental to the business):

(1) Name of court or agency where proceeding is pending;

(2) Date proceeding began;

(3) Principal parties;

(4) Description of facts underlying the proceedings; and

(5) Relief sought.

17 C.F.R. § 228.103; Form 10–KSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,-133 (Item 3) at 22,094 (Oct. 9, 2002) (referring the small business issuer to 17 C.F.R. § 228.103); Form 10–QSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,041 (Item 1) at 22,034 (Oct. 9, 2002) (referring the small business issuer to 17 C.F.R. § 228.103). "A legal proceeding need only be reported in the Form 10–QSB filed for the quarter in which it first became a reportable event and in subsequent quarters in which there have been material developments." Form 10–QSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,041 (Item 1) at 22,034 (Oct. 9, 2002).

On November 13, 2001, approximately three weeks after Messina filed suit, IDN reported in its Third Quarter 2001 10–QSB that:

On October 19, 2001, a former officer and director of the Company filed a lawsuit against the Company to force the Company to permit him to sell his restricted shares. The complaint also seeks damages of $29,350 for miscellaneous compensation and punitive damages of $3,000,000. The Company considers this former officer an "insider" subject to the rules under Section 144 of the Securities and Exchange Act of 1934. The Company feels it is acting properly and will defend itself vigorously. In addition, the Company intends to file a counter claim.

IDN's Third Quarter 2001 10–QSB, p. 9. Plaintiffs claim this disclosure was deficient in several respects:

i) the disclosure was late; that is, IDN should have informed the public about the suit at some point prior to November 13, 2001, see Second Amended Complaint at ¶ 52 and Pl. Br. at 17;

ii) the disclosure was misleading because it was "inaccurate," see Second Amended Complaint at ¶ 53;

iii) the disclosure was misleading because it failed to specify the allegations of the dispute, see id. at ¶ 52; and

iv) the disclosure was misleading because it did not reveal that Messina refused to cooperate with IDN in a separate patent lawsuit, see id. at ¶¶ 53–54.

Plaintiff's first allegation of impropriety, that the disclosure was late, fails as a matter of law. Regulation S–B clearly states that a "legal proceeding need only be reported in the Form 10–QSB filed for the quarter in which it first became a reportable event." Form 10–QSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,-041 (Item 1) at 22,034 (Oct. 9, 2002). The suit was filed on October 19, which is in

the fourth quarter. IDN reported the suit in its third quarter filing; thus, the disclosure was actually *early*. This claim is therefore dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

Plaintiffs' remaining allegations are that IDN's disclosure of the Messina suit was misleading in various ways. These claims are therefore subject not only to Rule 9(b)'s requirement of stating fraud with particularity and the PSLRA's requirement of scienter, but are also subject to the PSLRA's mandate that:

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> > (A) made an untrue statement of material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading....

*Advanta*, 180 F.3d at 530–31; 15 U.S.C. § 78u–4(b)(1).

Plaintiffs' contention that the disclosure was misleading because it was "inaccurate" is entirely unsupported by particulars. Plaintiffs allege nothing in support of this claim, and have therefore failed to comply with Rule 9(b). In addition, their failure to plead "the reason or reasons why" the disclosure was inaccurate is a violation of § 78u–4(b)(1) of the PSLRA. Without so much as an explanation as to why the disclosure was inaccurate, plaintiffs have likewise neglected to raise a strong inference of scienter, as required by § 78u–4(b)(2) of the PSLRA.

Plaintiff's third claim, that IDN's disclosure of the Messina suit was misleading because it failed to specify the allegations of the dispute, suffers from the same deficiencies. The disclosure in IDN's Third Quarter 2001 10–QSB reports that Messina sued the Company because it was not allowing him to sell restricted shares, on account of the Company's belief that he was an "insider." If plaintiffs are privy to other relevant details that IDN failed to disclose, they certainly have not plead those details, as required by Rule 9(b). Similarly, plaintiffs have not plead "the reason or reasons why" IDN's failure to disclose these (unspecified) details was misleading, as mandated by § 78u–4(b)(1) of the PSLRA. Without this information, the Court is unable to determine any basis of scienter on the part of the Company. If, for example, plaintiffs had plead, with particularized allegations in support thereof, that IDN purposefully withheld details of the suit that would have been damaging to the Company if publicized, perhaps they would have made the requisite showing of scienter. However, as it stands, the Second Amended Complaint falls far short of raising a strong inference that IDN intentionally or recklessly committed fraud by inadequately describing the Messina suit in its Third Quarter 2001 10–QSB.

■ Plaintiffs' fourth allegation pertains to the correlation between the Messina suit and IDN's patent suit against Identi–Scan that was pending at the time. As reported in IDN's Year 2000 10–KSB, the patent suit involved a dispute over which company held patent rights to the identification verification technology. Karam Dec. at Ex. C, p. 10. IDN's counsel in that suit identified Messina's "input on both our defensive case and affirmative claims against Identi–Scan as critical." Second Amended Complaint at ¶ 53. Yet on July 10, 2001, IDN's patent counsel informed the Company in writing that he had "endeavored unsuccessfully to obtain

Mr. Messina's assistance" in the patent litigation. *Id.* Plaintiffs allege that because the patent was so important to IDN's business, and because Messina's input was critical to IDN's success in the suit, then IDN should have disclosed that Messina did not intend to cooperate. *Id.* at ¶¶ 53–54. Thus, plaintiffs have complied with § 78u–4(b)(1) of the PSLRA by stating the reasons why they believe the disclosure was misleading.

However, plaintiffs have not plead enough to state a valid cause of action. Once a small business issuer has reported a legal proceeding in a SEC filing, Regulation S–B requires the company to report "material developments" in the case in subsequent quarterly reports. Form 10–QSB, Exchange Act, Fed. Sec. L. Rep. (CCH) ¶ 31,041 (Item 1) at 22,034 (Oct. 9, 2002). It is not clear from the Second Amended Complaint whether Messina's refusal to cooperate in the patent suit constituted a material development in that suit. What type of "input" could Messina have offered to the patent case? Why was the input "critical"? Could no one else at IDN offer such input? The Second Amended Complaint alleges none of these particulars, as required by Rule 9(b). Without these details, plaintiffs have also failed to raise a strong inference of scienter, as they must under § 78u–4(b)(2) of the PSLRA. If, for example, plaintiffs had plead allegations in support of a showing that Messina's cooperation was material to the patent suit, that his non-cooperation seriously hindered IDN's chances of success in the suit, and that IDN sought to conceal this development from the market, perhaps plaintiffs would have made a showing of scienter. However, the Second Amended Complaint contains no such allegations, and therefore fails to raise a strong inference that IDN intentionally or recklessly committed fraud by not revealing Messina's refusal to cooperate in the patent suit.

In sum: plaintiffs' claim of untimely disclosure of the Messina suit is dismissed pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs' second and third allegations with respect to the Messina suit are dismissed for failure to comply with: (1) Fed.R.Civ.P. 9(b); (2) the PSLRA's instruction to allege the "reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1); and (3) the PSLRA's requirement of pleading scienter, 15 U.S.C. § 78u–4(b)(2). The fourth allegation, that IDN should have reported Messina's refusal to cooperate in the patent suit, is dismissed because it fails to comply with Rule 9(b), and fails to raise a strong inference of scienter.

### E. IDN's Block of Messina's Sales of His Company Stock

█ As the "chief" component of their market manipulation claim, plaintiffs allege that IDN's improper refusal to allow Messina to sell his shares on October 12, 15, and 16, 2001, artificially affected the supply of IDN's stock on the market and constituted securities fraud. Second Amended Complaint at ¶¶ 56–58; Pl. Br. at 5. Plaintiffs contend that IDN blocked Messina's sales for the purpose of creating a "false shortage" of IDN's shares, which had the desired effect of artificially inflating the stock price. *Id.* at ¶ 58. Plaintiffs allege this effect on the market is shown by the fact that "IDN's share price has consistently dropped following Messina's sales on January 10, 2002, April 19, 2002, and May 7, 2002." *Id.*

Defendants argue that any claim based on the Messina suit lacks merit because the court in that case denied him injunctive relief and the case settled favorably for IDN. Def. Br. at 21. However, a review of the opinion in *Messina v. Intelli–Check, Inc.,* (N.Y.Sup.Ct.2001), Index No.

15970/01, submitted with defendants' brief, shows that the court did not discuss the merits of the case. The court denied the injunction Messina sought because any injury could be adequately compensated by money damages. *Messina* at *3. The likelihood of success on the merits was not addressed.

Defendants' arguments that the Messina suit was baseless, and that the Company settled the case favorably, are improper on a motion to dismiss. At this stage, the Court must accept well-pleaded facts as true. *See Burlington Coat Factory*, 114 F.3d at 1426. Thus, the Court must assume that IDN improperly interfered with Messina's right to sell his stock, thereby creating a false impression of the supply and demand for the security, and that IDN did so for the purpose of artificially inflating the price of the stock. Defendants' protestations to the contrary are better suited for summary judgment.

Thus, this claim will not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). However, plaintiffs have again failed to show scienter, as required by the PSLRA. They have not plead allegations sufficient to support a strong inference that IDN intentionally or recklessly committed fraud by blocking Messina's sale of his shares. In IDN's Third Quarter 2001 10–QSB, the Company reported that it was acting within its rights by refusing to allow an insider to sell his restricted shares. IDN's Third Quarter 2001 10–QSB, p. 9. As the court noted in *Messina v. Intelli–Check, Inc.*, the SEC has held that ownership of more than 10% of a company's shares supports a finding that the shareholder is an "affiliate" whose shares may only be sold pursuant to certain SEC rules. *Messina* at *2. IDN claimed that Messina, a former officer and director of the Company, by holding more than 14% of IDN's outstanding voting stock, so qualified as an "affiliate,"

and that his attempted sales did not comport with the SEC requirements. *See id.* While the court did not consider whether IDN's position was meritorious, plaintiffs have plead nothing to the contrary. Plaintiffs have not, for example, alleged that IDN blocked Messina's attempted sales despite knowing that the sales would have been in compliance with SEC rules. Accordingly, plaintiffs have failed to raise a strong inference that IDN intentionally or recklessly committed fraud by blocking Messina's sales. This claim is therefore dismissed for failure to show scienter, as required by the PSLRA.

## F. Rights Offering

■ On September 21, 2001, IDN filed a Registration Statement with the SEC announcing a rights offering for 970,076 of its shares, whereby its stockholders were to receive one non-transferable right to purchase one share of IDN's common stock at $8.50 a share for every ten outstanding shares of common stock held on March 30, 2001. Second Amended Complaint at ¶ 60. Plaintiffs allege that the rights offering harmed them because it had "the effect of increasing the cost to cover their short positions." *Id.* at ¶ 63.

Defendants correctly argue that a rights offering is perfectly legal. Plaintiffs do not allege that defendants in any way violated the SEC's rules and regulations governing rights offerings. In an effort to cast some taint on the matter, plaintiffs contend that IDN's Prospectus filed in connection with the rights offering incorporated by reference its prior SEC filings which contained the misleading comparisons of current revenues with prior sales, and in which IDN also failed to properly disclose the existence of VeriFone and the details of the Messina suit. *Id.* at ¶ 61. This Court declines plaintiffs' invitation to consider these claims as inextricably inter-

twined. District courts are required to separate claims of fraud and deal with each individually. *Westinghouse,* 90 F.3d at 712. Each claim rises or falls on its own merits. I therefore reject plaintiffs' argument that a perfectly legal rights offering can be made fraudulent because its Prospectus incorporated by reference other allegedly fraudulent filings.

Accordingly, this claim is dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

### G. Interference with Borislow's Trading

Plaintiffs plead only one sentence in support of this allegation:

> In addition to the improper activities alleged above, defendants directly or through their legal counsel have interfered with plaintiff's relationship with plaintiff's stock broker, caused an investigation by the SEC into plaintiff's trading activities, attempted to interfere with efforts by plaintiff's [sic] to cover their short positions and otherwise targeted plaintiffs in order to adversely impact their short positions.

*Id.* at ¶ 59.

This claim is woefully inadequate. It does not come close to passing Rule 9(b)'s requirement that fraud allegations must be plead with particularity. Rule 9(b), rigorously applied in securities fraud cases, requires at a minimum that plaintiffs support their allegations with all of the necessary factual background that would accompany "the first paragraph of any newspaper story," that is, the "who, what, when, where and how" of the relevant events. *Rockefeller,* 311 F.3d at 217 (citations omitted).

The vagueness of this claim begs a host of unanswered questions: Who interfered with Borislow's relationship with his stock broker? How was this done? When and where did this happen? Who is Borislow's stock broker? What is wrong with "caus[ing] an investigation by the SEC into plaintiff's trading activities"? Who "attempted to interfere with efforts by plaintiff's [sic] to cover their short positions?" What does that mean? Who "otherwise targeted plaintiffs"? What does that mean? Who is bringing this claim—Borislow or all three plaintiffs? How is any of this a violation of Section 10(b) and Rule 10b–5? Where is the strong inference of scienter?

This claim is dismissed for failure to comply with Fed.R.Civ.P. 9(b) and the PSLRA.

### H. Claims Against Individual Defendants

#### 1. Section 20(a)

Plaintiffs bring a claim against each of the individual defendants—Frank Mandelbaum, Paul Cohen, Edwin Winiarz, and W. Robert Holloway—based on Section 20(a) of the Exchange Act. Section 20(a) creates a cause of action against individual defendants alleged to have been "control persons" of companies guilty of securities fraud. The section provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). One can be liable under this section for controlling a company that committed securities fraud. *See In re: MobileMedia Securities Litig.,* 28 F.Supp.2d 901, 940 (D.N.J.1998). Plain-

tiffs must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions. *Id.; Campbell Soup*, 145 F.Supp.2d at 599. "To establish that a defendant is a control person, a plaintiff must demonstrate [that] 'the defendant had actual power or influence over the allegedly controlled'" company. *MobileMedia*, 28 F.Supp.2d at 940 (citations omitted).

In *MobileMedia*, plaintiffs alleged that defendant was a director of the company who had, and exercised, power to influence and control the company. *Id.* Defendant argued that he did not have sufficient control over the company for purposes of a Section 20(a) violation. *See id.* Rejecting that argument as a question of fact improperly raised at the motion to dismiss stage, the court held that plaintiffs sufficiently plead control person status. *Id.*

Only defendants W. Robert Holloway and Paul Cohen contest that they are control persons. Def. Br. at 27–28. They claim that they are low-level officers or outside directors. Plaintiffs have alleged that Holloway was a Senior Executive Vice President of IDN, Cohen was a director of IDN, and that:

> By virtue of [their] positions with the Company, [they] had the authority and, in fact, ability to control the contents of the company's annual and quarterly reports filed with the SEC, and press releases, including IDN's reported revenues. Further, [their] actions during the Period caused the material misstatement of the Company's financial conditions and results as alleged herein. [They were] aware that the contents of the Company's publicly disseminated reports and press releases alleged herein were misleading and had the ability and opportunity to prevent their issuance or

cause them to be corrected, but failed to do so.

Plaintiffs further allege that the individual defendants:

> had the power and influence and exercised the same to cause IDN to engage in the illegal conduct and practices complained of herein by causing the company to disseminate the false and misleading information referred to above.

Second Amended Complaint ¶¶ 13,15, 92. Plaintiffs have sufficiently alleged that Holloway and Cohen "had actual power or influence" over IDN's public filings and press releases. *See MobileMedia*, 28 F.Supp.2d at 940. As the *MobileMedia* court found, defendants' arguments to the contrary are questions of fact which are improper at the motion to dismiss stage. *Id.*

The Court notes that both defendants and plaintiffs in their briefing on Section 20(a) present arguments that are without sufficient legal support. Defendants argue that a cause of action for control person liability must include facts showing defendants' "culpable participation" in the company's wrongdoing. Def. Br. at 28. While plaintiffs will have to prove culpable participation at trial, *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 889–90, the "overwhelming trend in this circuit" is that culpable participation does not have to be plead in order to survive a motion to dismiss. *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F.Supp. 1003, 1013 (D.N.J.1996) ("plaintiff need only plead circumstances establishing control because: (1) the facts establishing culpable participation can only be expected to emerge after discovery; and (2) virtually all of the remaining evidence, should it exist, is usually within the defendants' control.") (quotations omitted); *accord Campbell*, 145 F.Supp.2d at 600 (collecting cases).

For their part, plaintiffs argue that they should be entitled to the "group pleading doctrine," which would allow them "to avoid the requirement of informing each defendant of the nature of his or her alleged participation in a fraud." Pl. Br. at 25. However, since the passage of the PSLRA, mandating strict pleading requirements in claims of securities fraud, courts in this circuit have declined to apply the lenient group pleading doctrine. *E.g., Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103, *5 (E.D.Pa.1999) (the group pleading doctrine "is inconsistent with the PSLRA's purpose" of imposing heightened pleading standards); *In re: Home Health Corp. of America, Inc. Securities Litig.,* 1999 WL 79057, * 21 (E.D.Pa.1999) (same). This Court agrees with *Marra* and *Home Health Corp.* that the application of the group pleading doctrine would circumvent the PSLRA's heightened pleading requirements. As such, the doctrine is not available to plaintiffs.

In any event, plaintiffs have adequately plead control person status under Section 20(a) for the individual defendants.

## 2. The Individual Defendants' Scienter

In addition to pleading control person status for purposes of Section 20(a), plaintiffs must also raise a strong inference that each individual defendant acted with scienter, as required by the PSLRA. Scienter is adequately plead by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior" or by alleging facts "establishing a motive and an opportunity to commit fraud." *Advanta,* 180 F.3d at 534–35. A showing of scienter with respect to a company does not amount to a showing of scienter with respect to any officer or director of the company, since "[g]eneralized imputations of knowledge do not suffice regardless of the defendant's position within the company." *Oran,* 226 F.3d at 290 (quoting *Advanta,* 180 F.3d at 539). Blanket allegations that defendants stood to benefit from wrongdoing and had the opportunity to commit fraud are not sufficiently plead under the PSLRA because they do not state facts with particularity or give rise to a strong inference of scienter. *Burlington Coat Factory,* 114 F.3d at 1424. Similarly, conclusory assertions that defendants acted "knowingly," or that, because of a defendant's position in a company, he or she "must have known" of alleged fraud are insufficient to establish scienter. *Advanta,* 180 F.3d at 539 (citation omitted).

Plaintiffs allege the following as evidence of scienter for the individual defendants:

68. As alleged herein, the Defendants acted with scienter in that they:

(a) knowingly or recklessly engaged in acts and practices and a course of conduct which had the effect of artificially inflating the price of IDN's stock in the "Bubble Period"; and/or

(b) knowingly or recklessly manipulated the supply of IDN stock through the Messina lawsuit, the rights offering and other acts directed at short sellers.

70. Defendants also had the motive and opportunity to engage in the wrongful conduct described herein to maintain the value of their own holdings of IDN.

93. The Individual Defendants were motivated to act as aforesaid and to cause the stock value to be artificially inflated by reason of their ownership and sale of IDN stock for their personal benefit and to facilitate the success of the pending IDN rights offering. The Individual Defendants had actual knowledge of the facts making the material statements false and misleading, or act-

ed with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

Second Amended Complaint at ¶¶ 68, 70, 93.[22] Paragraph 68 is precisely the type of conclusory allegation found to be insufficient in *Advanta.* 180 F.3d at 539. Plaintiffs fail to allege any support for their bald claim that the individual defendants knowingly or recklessly engaged in any acts.

Paragraphs 70 and 93 allege that defendants committed fraud in order to "maintain the value of their holdings" in the Company and to profit by selling their stocks at an inflated price. The Third Circuit has found that in order to successfully plead scienter in this fashion, plaintiffs must allege that defendants sold shares, "at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *Burlington Coat Factory,* 114 F.3d at 1424. Plaintiffs cannot successfully use this method of showing scienter with respect to a defendant who sold no shares during the relevant time period. *Oran,* 226 F.3d at 289. Plaintiffs have alleged the following regarding defendants' stock sales:

- Mandelbaum: in 2001, "sold more than $351,000 worth of IDN common stock at substantial gain."
- Cohen: in December 2000 and 2001, "sold more than $1,000,000 worth of IDN common stock at substantial gain."
- Winiarz: no sales.
- Holloway: no sales.

Second Amended Complaint at ¶¶ 12–15. Plaintiffs have failed to show that Winiarz

and Holloway had a motive to commit fraud. *See Oran,* 226 F.3d at 289. Plaintiffs' allegations of Mandelbaum and Cohen's sales are not nearly specific enough to support a strong inference of scienter. There is no indication whether these sales were uncommon for the two; perhaps they normally trade this quantity of stock. More importantly, it is impossible to tell whether any of these sales occurred during plaintiffs' alleged "bubble period," which lasted from September 2001 through May 29, 2002. Plaintiffs have therefore failed to raise a strong inference of scienter with respect to Mandelbaum and Cohen as well. *Id.* at 290.

In sum, plaintiffs have not shown scienter with respect to any of the individual defendants. The claims against them are therefore dismissed pursuant to the PSLRA.

## V. CONCLUSION

In conclusion, the following claims are dismissed pursuant to Fed.R.Civ.P. 12(b)(6):

- comparison of prior sales with current revenues in IDN's Third Quarter 2001 10–QSB, *see supra* section IV.A.1
- failure to disclose the existence of VeriFone (for Jones only), *see supra* section IV.A.2
- IDN's allegedly late disclosure of the Messina suit, *see supra* section IV.D
- the rights offering, *see supra* section IV.F.

These claims cannot be replead.

The following claims are dismissed for failure to comply with Fed.R.Civ.P. 9(b) and/or the PSLRA:

---

**22.** Plaintiffs also suggest that IDN was motivated by a desire to harm plaintiffs specifically. *See* Second Amended Complaint at ¶¶ 42, 55. Plaintiffs do not allege that the individual defendants shared this motivation, nor do plaintiffs offer any particularized allegations whatsoever in support of that contention.

- failure to disclose the existence of VeriFone (for Borislow and D & K Charitable Foundation), *see supra* section IV.C

- allegation that disclosure of the Messina suit was misleading because it was inaccurate, *see supra* section IV.D

- allegation that disclosure of the Messina suit was misleading because it failed to specify the details of the suit, *see supra* section IV.D

- failure to report Messina's refusal to cooperate in the patent suit, *see supra* section IV.D

- blocking of Messina's attempts to sell his company shares, *see supra* section IV.E

- interference with Borislow's trading, *see supra* section IV.G

- Section 20(a) claims against the individual defendants, *see supra* section IV.H.2.

In addition, plaintiffs have failed to plead the dates on which they each became aware of each allegedly fraudulent misrepresentation or act, *see supra* section IV.A.2, and the dates and details of their short sale transactions, *see supra* section IV.B, as is in this case required by Fed. R.Civ.P. 9(b). Plaintiffs will be given the opportunity to move for leave to amend their complaint to account for the Rule 9(b) and PSLRA deficiencies within thirty days of the entry of the accompanying Order. *See Nappier,* 227 F.Supp.2d at 282 (granting motion to dismiss for failure to adequately plead scienter, but allowing plaintiffs to move to amend complaint through submission of proposed amended complaint containing more factual support for scienter). If plaintiffs choose to timely move for leave to file a Third Amended Complaint, the Court will then consider whether the amendments would be futile.